**E.T. BARWICK INDUSTRIES, INC., a corporation, and E.T. Barwick, an individual, Plaintiffs,**

**v.**

**WALTER E. HELLER AND CO., a corporation, Franklin Cole, and Tom Henderson, individuals, Defendants.**

**WALTER E. HELLER & CO., a corporation, Plaintiff,**

**v.**

**E.T. BARWICK INDUSTRIES, INC., a corporation, Defendant.**

Civ. A. Nos. C83–77R, C83–278R.

United States District Court
N.D. Georgia,
Rome Division.

Dec. 22, 1987.

Philip R. Russ, Russ & Clark, Amarillo, Tex., W. Baer Endictor, Atlanta, Ga., William J. Cade, Cade & Saunders, Albany, N.Y., Bobby Lee Cook, Summerville, Ga., for plaintiffs.

Richard M. Kirby, Hansell & Post, Atlanta, Ga., for Ernst & Whinney.

Rene A. Torrado, Jr., Dan K. Webb, Winston & Strawn, Chicago, Ill., William E. Davidson, Jr., Rome, Ga., David G. Ross & John Marshall, Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., for defendants.

Peter J. Kilchenmann, Chicago, Ill., for First Nat. Bank of Chicago (motion to quash subpoena only).

## ORDER

HAROLD L. MURPHY, District Judge.

Presently before the Court are defendants' motion for summary judgment with regard to the claims brought by plaintiffs and defendant Heller's motion for partial summary judgment with regard to certain defenses raised by plaintiffs in response to defendant Heller's Counterclaim. For the reasons stated below, defendants' motion for summary judgment is GRANTED on every issue except the issues relating to plaintiffs' claims with respect to the application of funds to the April 1979 note which was guaranteed by E.T. Barwick. The Court desires to hold an oral hearing as to these remaining issues. Likewise, the Court determines it best to hold an oral hearing with regard to defendant Heller's motion for partial summary judgment on the defenses raised by plaintiffs to Heller's Counterclaim.

## THE PARTIES

Plaintiff E.T. Barwick Industries, Inc. ("Industries") was a Georgia corporation engaged in the manufacture and sale of carpet. Industries ceased manufacturing no later than January of 1980. Plaintiff E.T. Barwick was the Chief Executive Officer and President of Industries on September 29, 1978, and at all pertinent times thereafter. Defendant Heller Financial, Inc. ("Heller"), formerly known as Walter E. Heller & Company, is a Chicago-based corporation incorporated in the State of Delaware. Heller, a wholly-owned subsidiary of Heller International Corporation, is involved in the commercial finance industry which includes secured lending, asset-based lending and factoring.[1] At all pertinent times, defendant Franklin Cole was Chairman of the Board of Heller, and defendant Thomas Henderson was Vice-President in charge of Heller's Central Factoring Division.

## THE PARTIES' BUSINESS RELATIONSHIP

As of September 1978, Industries was indebted to a consortium of banks and insurance companies in the amount of $46,-340,000.00. It was also indebted to Heller in the amount of $13,559,000.00 on account of factoring and loan transactions.[2]

On September 29, 1978, Industries and Heller entered into a series of agreements. The first was a "Secured Loan Agreement," which provided that Industries' indebtedness would be restructured. That agreement provided that Heller would lend Industries $17.5 million. The proceeds of this loan would be used first to pay off all of Industries' outstanding indebtedness to the consortium of lenders. Loan proceeds remaining after the payments to the creditors would be used by the carpet manufacturer as working capital.

The Secured Loan Agreement also provided for the restructuring of Industries' indebtedness of $13,559,000.00 to Heller in the following manner:

(a) Industries' indebtedness was reduced by $4,403,571.11 through Industries'

---

1. In a commercial factoring relationship, a factor and its client enter into an agreement whereby the factor agrees to purchase at a discount some or all of the client's accounts receivable. Depending on the creditworthiness of the client's customers, Heller typically purchased the accounts receivable either on a "Heller risk" or on a "client risk" basis. If the account receivable was purchased on a "Heller risk" basis, Heller assumed the risk that the client's customer would not be financially able to pay the amount due. If the account receivable was purchased on a "client risk" basis, Heller could seek payment from the client, or charge back against the client's factoring reserve, in the event the client's customer failed to pay the amount due.

2. Plaintiffs claim that as of September 1978, Industries was indebted to Heller in the amount of $12,556,000.00 (Plaintiffs' Statement of Material Facts ¶ 51).

transfer of $4,403,571.11 in outstanding accounts receivable to Heller;

(b) Industries' indebtedness was further reduced when it directed that $5,138,560.86 in its factoring reserve be transferred to Heller; and

(c) Industries' remaining indebtedness ($4,056,917.39) was restructured when Heller accepted promissory notes from Industries in the amounts of $3,465,905.23 and $591,012.16.

Also on September 29, 1978, Industries and Heller entered into a "Maturity Factoring Agreement." This agreement provided that Heller would be Industries' sole factor and that Heller would advance money to the carpet manufacturer in amounts up to 90% of the face value of accounts receivable factored at "Heller risk."

Subsequent to the above described debt restructuring, Industries continued to lose approximately $2 million per month. In April 1979, Industries requested and obtained an additional loan of $3.5 million from Heller. This additional loan was represented by a promissory note executed by Industries' representatives on April 9, 1979. The parties agreed that the principal balance of the loan could be repaid by applying specified percentages of amounts received by Heller in payment of Industries' factored receivables. The agreement specified that 10% of the payments received during the period from April 9 to April 30 were to be applied to the debt; 12.5% during the period from May 1 through May 31, 1979; and 15% for payments after May 31, 1979. Heller also obtained Barwick's personal guaranty of the $3.5 million loan.

On June 30, 1979, Industries failed to pay the quarterly interest then due on its outstanding indebtedness to Heller. Defendants allege that in July 1979, Heller and Industries reached an agreement concerning the payment of the overdue interest. They allegedly agreed that Heller would suspend the application of a percentage of funds received on account of factored receivables to reduce the April 9, 1979, loan indebtedness and instead apply those amounts to pay the interest that had become due on July 1, 1979. The suspension of the application of a percentage of the funds due on Industries' factored receivables in order to satisfy the overdue interest obligation continued through August 1979. Once the overdue interest obligation was satisfied, the application of the specified percentage of payments on factored invoices to reduce the principal balance of the April 1979 loan was resumed.

Although Industries was in default on its indebtedness to Heller as of January 1980, Heller waited until early 1983 before notifying Industries that it intended to commence foreclosure proceedings.

On February 18, 1983, Barwick and Industries filed the present action. On February 22, 1983, Heller instituted foreclosure proceedings in the Superior Court of DeKalb County, Georgia. After the state court granted Heller a writ of possession, the action was removed to this Court and consolidated with the instant action.

Heller maintains that as of December 31, 1986, the total amount of Industries unpaid indebtedness was $51,050,608.77. Of this amount, it is alleged that $1,771,374.84 remains due and owing on the April 9, 1979, note which was personally guaranteed by E.T. Barwick.

By Order dated June 27, 1986, the Court attempted to set out the remaining issues in this case. Those issues include whether defendants violated any antitrust, RICO, tort or contract law. Defendants now move for summary judgment on all issues that relate to defendants' liability to plaintiffs. Heller also moves for summary judgment on plaintiffs' contract defenses to Heller's claim for recovery of plaintiffs' indebtedness to Heller.

Fed.R.Civ.P. 56(c) authorizes summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." The party seeking summary judgment bears the burden of demonstrating that no dispute as to any material fact exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Bingham, Ltd. v. United States,* 724 F.2d 921, 924 (11th Cir.

1984). The moving party's burden is discharged merely by " 'showing'—that is, pointing out to the District Court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265, 275 (1986). In assessing whether the movant has met this burden, the evidence and all factual inferences should be viewed in the light most favorable to the party opposing the motion. *See Bradbury v. Wainwright*, 718 F.2d 1538, 1543 (11th Cir.1983). Once the moving party has adequately supported his motion, the nonmovant then has the burden to show that summary judgment is improper, coming forward with specific facts showing a genuine dispute. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 584–588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986). And in deciding a motion for summary judgment, it is no part of the court's function to decide issues of genuine material fact but solely to determine whether there is such an issue to be tried. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986); *Warrior Tombigbee Transportation Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir.1983). A District Court "can only grant summary judgment 'if *everything* in the record ... demonstrates that no genuine issue of material fact exists.' " *Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir.1986), quoting *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410 (5th Cir.1980) (emphasis in original).

Genuine disputes are those by which the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson*, 477 U.S. at 247–249, 106 S.Ct. at 2510, 91 L.Ed.2d at 211–12. Moreover, for factual issues to be "genuine" they must have a real basis in the record. *Matsushita*, 475 U.S. at 584–588, 106 S.Ct. at 1356, 89 L.Ed.2d at 552. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genu-

ine issue for trial.' " *Id.* at 584–588, 106 S.Ct. at 1356, 89 L.Ed.2d at 552. "[T]his standard mirrors the standard for a directed verdict.... [T]he inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 250–253, 106 S.Ct. at 2511–2512, 91 L.Ed.2d 213–14.

## THE ALLEGED ILLEGAL TYING AND RECIPROCAL DEALING ARRANGEMENTS

By Order dated June 27, 1986, the Court attempted to set out the antitrust issues which existed in this lawsuit. The tying issue was defined as follows:

> Whether defendants entered into illegal tying arrangements by extending collection and credit services upon the condition that manufacturers factored by defendants purchase only from suppliers factored by defendants.

In response to defendant's motion for summary judgment as to this issue, plaintiffs have asserted two additional issues under a reciprocal dealing arrangement theory. Specifically, plaintiffs allege that (1) the April 1979 working capital loan ($3.5 million) was conditioned on Industries' purchase of supplies from, and sale of finished goods to, Heller-factored clients; and (2) Heller tied the maturity factoring agreement to the September 29, 1978, refinancing ($17.5 million).

The Court will grant defendants' motion for summary judgment as to plaintiffs' reciprocal dealing arrangement theories on the grounds that these issues were not defined as issues in the June 27, 1986, Order. Alternatively, the Court will grant defendants' motion for the reasons set forth below.

"A tying arrangement is 'an agreement by a party to sell one product [the "tying" product] but only on the condition that the buyer also purchases a different (or "tied") product.' " *Tic–X–Press, Inc. v. Omni Promotions Co. of Ga.*, 815 F.2d 1407, 1414 (11th Cir.1987) (brackets in original),

*quoting, Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Not all tying arrangements violate Section 1 of the Sherman Act.[3] *Jefferson Parish Hosp. Dist. v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed. 2d 2 (1984).

To prove an illegal tying arrangement a plaintiff must establish the following elements:

1) that there are two separate products, a "tying" product and a "tied" product;

2) that those products are in fact "tied" together—that is, the buyer was forced to buy the tied product to get the tying product;

3) that the seller possesses sufficient economic power in the tying product market to coerce buyer acceptance of the tied product; and;

4) involvement of a "not insubstantial" amount of interstate commerce in the market of the tied product.

*Tic–X–Press, Inc.,* 815 F.2d at 1414; *see also Amey, Inc. v. Gulf Abstract & Title, Inc.,* 758 F.2d 1486, 1502–03 (11th Cir. 1985), *cert. denied,* 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986).

The Supreme Court has stated that

the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.

*Jefferson Parish Hosp.,* 466 U.S. at 12, 104 S.Ct. at 1558. Thus, the key to proving such an arrangement's illegality "is the seller's ability to *force* buyers to purchase one product in the package, the tied product, by virtue of the seller's control or dominance over the other product in the package, the tying product." *Tic–X–Press, Inc.,* 815 F.2d at 1414. (emphasis in original).

A reciprocal dealing arrangement exists when two parties face each other as both buyer and seller and one party offers to buy the other party's goods, but only if the second party buys other goods from the first party. *Spartan Grain & Mill Co. v. Ayers,* 581 F.2d 419, 424 (5th Cir.1978), *cert. denied,* 444 U.S. 831, 100 S.Ct. 59, 62 L.Ed.2d 39 (1979); *Southern Concrete Co. v. United States Steel Corp.,* 535 F.2d 313, 317 (5th Cir.1976), *cert. denied,* 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977). "With the exception that reciprocal dealing does not require the seller of the dominant product to act as seller in both markets, tying and reciprocal dealing are similar phenomena, and are judged according to the same legal standards." *Skepton v. County of Bucks, Pa.,* 613 F.Supp. 1013, 1018 (E.D.Pa.1985), *citing Betaseed, Inc. v. U. and I. Incorporated,* 681 F.2d 1203, 1216–17 (9th Cir.1982); *Spartan Grain and Mill Co.,* 581 F.2d at 425.

Where credit is alleged to be the tying product, there is no basis for treating it differently, for Sherman Act § 1 purposes, from other goods and services since credit, when used as a tying product, may extend the seller's economic power to foreclose competition in the tied product. *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 508–09, 89 S.Ct. 1252, 1261–1262, 22 L.Ed.2d 495, 508 (1968) (*"Fortner I"*).

Plaintiffs claim they can prove two instances of *per se* restraints of trade. The first of these alleged arrangements was Heller's conditioning of the extension of credit upon Industries' purchase of supplies from Heller-factored suppliers and upon Industries' sale of mill goods on preferential terms to certain Heller-factored distributors. Although this allegation does not fit the classic definition of a tying arrangement (the dominant party is the seller in both the tying and tied product) or a reciprocal dealing arrangement (both parties agree to buy goods or services from each other), Industries maintains the same legal standards apply since the alleged arrangements restrained the weak buyer's (Industries') competitive trading position.

**3.** Section 1 of the Sherman Act prohibits "[e]very contract, combination ... or conspir-

acy in restraint of trade or commerce among the several States...." 15 U.S.C. § 1.

Even assuming *per se* restraint of trade exists where one party extends credit on the condition that the second party buy its supplies and/or sell its goods to suppliers and distributors who in turn are factoring clients of the first party, Industries has failed to show that genuine issues of fact exist as to these alleged arrangements.

To prevail on their claim plaintiffs must show, among other things, that the transactions (extension of credit and buying from named suppliers or selling to named distributors) were tied and the involvement of a "not insubstantial" amount of interstate commerce in the market of the tied product. For the following reasons, the Court concludes that plaintiffs have failed to present any evidence which would support these essential elements.

Neither the September 29, 1978, Secured Loan Agreement nor the April 9, 1979, loan agreement set out in writing that Industries would be required to purchase from and sell to Heller-factored suppliers and distributors. Heller contends that the deposition testimony of E.T. Barwick undisputedly shows that after October 1978,[4] he was not coerced by Heller into buying from certain suppliers. (Barwick dep. pp. 194–96).

In response, plaintiffs contend that Heller representatives made suggestions as to whom Industries should buy supplies. Plaintiffs argue that given Heller's enormous control over Industries cash flow,[5] any suggestion by Heller was Industries' command.

"[T]he courts have never required direct evidence of coercive behavior to prove a tying violation. It is well established that coercion may be established by showing that the facts and circumstances surrounding the transaction as a practical matter forced the buyer into purchasing the tied product." *Tic–X–Press, Inc.*, 815 F.2d at 1418; *see Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 377 (5th Cir.1977).

The problem with plaintiffs' claim in this instance is that while they argue the facts and circumstances surrounding Heller's alleged "suggestions" forced Industries to buy from and sell to Heller-factored clients, plaintiffs have offered no evidence which would show that these suggestions were carried out. There is an absolute dearth of evidence which would show a single instance within the relevant four-year limitation period where Industries, at Heller's "suggestion," purchased supplies from, or sold goods to, other Heller clients. Accordingly, whether such arrangement be characterized as tying or reciprocal dealing, the Court concludes that plaintiffs have failed to prove Heller's extension of credit was conditioned upon Industries' carrying out Heller's suggestions. *See e.g. Kellam Energy Inc. v. Duncan*, 668 F.Supp. 861, 881 (D.Del.1987) (As a precondition to a tying claim, the buyer must actually purchase or lease the unwanted product.).

There being no evidence regarding any business transactions among Industries and Heller-factored suppliers and distributors which were instigated at Heller's "suggestion," the Court certainly can not determine whether there was involvement of a "not insubstantial" amount of interstate commerce in the market of the tied product. No figures have been offered which show any effect Industries' purchases from or sale to other Heller clients (if in fact these transactions occurred) had on interstate commerce in those markets.

---

**4.** Plaintiffs filed their complaint on February 18, 1983. 15 U.S.C. § 15b provides for a 4-year statute of limitations on antitrust claims; therefore, admissible evidence of an illegal tying or reciprocal dealing arrangement is limited to events occurring after February 18, 1979.

**5.** In support of this contention, Industries points to a provision in the 1978 Maturity Factory Agreement which provides:

4.3 *Reserves.* As security for any and all obligations at any time owing to use and secured hereby, we shall have the right to reserve and withhold portion of the amount due on each account which we purchase from you hereunder *as we deem reasonable,* which portion is herein called the "Reserves."

The Court assumes Industries' argument is that Heller could indiscriminately increase the monies held in reserve and thereby effectively cutoff Industries' cash flow.

Further supporting the above conclusions is the testimony of Steven Diamond and Thomas Henderson which suggests that after the September 29, 1978, restructuring of Industries' indebtedness, Heller indirectly sought to discourage Industries from purchasing supplies from Heller clients by advising Industries that it would not purchase from such suppliers any invoices representing sales of materials to Industries. (Diamond dep. p. 56; Henderson dep. pp. 262–63).[6] Furthermore, no evidence has been presented showing that Heller, after September 29, 1978, did in fact purchase invoices representing a supplier's sale of materials to Industries.

Finally, even though plaintiffs have presented affidavits from representatives of other carpet manufacturers which state that Heller required those manufacturers to deal with Heller-factored suppliers and distributors, plaintiffs may not rely on a Rule of Reason analysis to defeat the present motion for summary judgment because, again, they have failed to submit any evidence showing that Industries bought supplies or sold goods to Heller-factored clients at Heller's "suggestion."

■ The second instance of a *per se* restraint of trade claimed by plaintiffs is the allegation that Heller promised additional funding for Industries' operations upon the condition that Industries factor its accounts receivable exclusively with Heller. Plaintiffs contend this agreement is an illegal tying arrangement in the sense that Heller agreed to provide additional funding (the tying product) upon the condition that Industries accept Heller's factoring services (the tied product). It is also contended that this arrangement can be construed as reciprocal dealing in that Heller agreed to extend additional funding upon the condition that Industries reciprocate by "selling" Heller its accounts receivable under the terms and conditions of the 1978 Maturity Factoring Agreement.

Defendants move for summary judgment on the grounds that plaintiffs have failed to demonstrate the existence of a genuine issue of material fact with regard to whether Heller possessed sufficient economic power in the credit market (tying market) such as to coerce Industries' acceptance of the Maturity Factoring Agreement (tied product). In other words, Heller contends plaintiffs have failed to show Heller's dominance of the relevant credit market or the uniqueness of Heller's credit. *See United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977) ("*Fortner II*").

In *Fortner II*, the Supreme Court held that in situations such as found in the case at bar, the focus of attention should be

> on the question whether the seller has the power, within the market for the tying product, to raise prices or to require purchasers to accept burdensome terms that could not be exacted in a completely competitive market. In short, the question is whether the seller has some advantage not shared by his competitors in the market for the tying product.

*Id.*, 429 U.S. at 620, 97 S.Ct. at 867, 51 L.Ed.2d at 89–90.

To meet the burden of showing the requisite market power in the credit market, plaintiffs must show that Heller "had some cost advantage over its competitors—or could offer a form of financing that was significantly differentiated from that which other lenders could offer if they so elected." *Id.*, 429 U.S. at 622, 97 S.Ct. at 868, 51 L.Ed.2d at 91.

A showing that a defendant's financing was unique could satisfy the requisite need for market power; however, "if the evidence merely shows that credit terms are unique because the seller is willing to accept a lesser profit—or to incur greater risks—than its competitors, that kind of uniqueness will not give rise to any inference of economic power in the credit mar-

---

6. The only evidence offered by plaintiffs to dispute this testimony are the affidavits of W. Baer Endictor and Samuel S. Sobelman which state that prior to October 1, 1978, they had no communications with Mr. Diamond or Mr. Henderson.

ket." *Id.,* 429 U.S. at 621–22, 97 S.Ct. at 868–869, 51 L.Ed.2d at 90.

Plaintiffs claim it was Heller's unique cost advantage over competitors that enabled Heller to extend to Industries the highly attractive 1978 loan package. In their revised response, they maintain that the loan package was uniquely attractive in that it provided highly favorable amortization and interest rates. Under *Fortner II,* this claim is clearly insufficient in that plaintiffs have failed to show that other potential lenders were unable to provide the same credit terms had they been willing to take the risk.

It is not until their sur-reply [7] that plaintiffs claim Heller enjoyed unique advantages over its competitors in being able to fund the following as part of the 1978 refinancing:

1. $5,138,560.86 out of funds belonging to Industries and not Heller, on deposit with Heller as client factoring reserves.
2. $4,403,571.11 in accounts receivable already scheduled with Heller for factoring and which had already been evaluated by Heller in terms of credit-worthiness.

Plaintiffs' contentions must be viewed in the light of the relevant background. The $17.5 million loan was for the purpose of allowing Industries to satisfy its indebtedness to its other creditors. The transfers to which plaintiffs refer were made to satisfy a portion of the $13.5 million that was already due and owing to Heller as of the date of the loan restructuring (September 29, 1978). Thus, as the Court interprets the 1978 Secured Loan Agreement, Heller loaned Industries $17.5 million, and as part of that agreement Industries' prior indebtedness to Heller in the amount of $13.5 million was restructured, *i.e.,* the $5,138,-560.86 and $4,403,571.11 transfers reduced the $13.5 million indebtedness to $4,056,-917.39.

At its core, plaintiffs' argument is that the restructuring of Industries' prior indebtedness to Heller made the entire loan

package uniquely attractive in that only Heller could take advantage of Industries' factoring reserves held by Heller, and only lenders dealing in accounts receivable could take advantage of these accounts.

The problem with plaintiffs' position is that its $13.5 million indebtedness to Heller would have had to have been satisfied in any event. The fact that the parties agreed the existing debt would be satisfied by Heller taking advantage of the already existing reserves and accounts receivable rather than lending money to Industries in an amount over $17.5 million does not make the restructuring unique for illegal tying purposes. Moreover, as defendants point out, even if Industries, given its poor financial condition in 1978, had obtained a loan from another lender, the proceeds of such a loan may well have been used to repay Industries' outstanding indebtedness to Heller.

In any event, the crux of plaintiffs' tying arrangement claim is that the tying product was "additional funding." Given that the only additional funding provided in 1978 was the $17.5 million loan, the Court must conclude that plaintiffs have failed to raise a genuine issue of material fact as to whether Heller possessed a cost advantage in the credit market. Plaintiffs have not shown that the form of financing provided in 1978 was significantly differentiated from that which other financial institutions could have offered had they elected to do so. Accordingly, defendants' motion for summary judgment as to the tying/reciprocal dealing arrangements is GRANTED.

## THE ALLEGED HORIZONTAL AND VERTICAL PRICE FIXING AGREEMENTS

The second antitrust issue (price fixing) set out in the Court's June 27, 1986, Order was defined as follows:

"Whether defendants fixed prices at which manufacturers could sell and whether this practice constitutes vertical

---

7. The Court notes that this sur-reply was not filed until nearly five months after the defend-

ants' motion for summary judgment was filed.

price fixing in the nature of resale price maintenance."

Defendants move for summary judgment on the grounds that there existed no agreement between a supplier and a customer fixing the resale price of a commodity. In their response, plaintiffs again expand upon the Court defined issue and argue that horizontal price fixing existed and that Heller fixed the resale price of accounts receivable. Since the issues raised by plaintiffs were not defined as issues in the June 27, 1986, Order, the Court finds that defendants are entitled to summary judgment as to these issues. Nevertheless, assuming *arguendo* the issues presented by plaintiffs are properly before the Court, the Court finds there to be no genuine issues of fact as to any of the alleged price fixing agreements.

As an initial matter the Court concludes that under *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), plaintiffs' contention that defendant Franklin Cole conspired with Heller to fix prices is without merit. Franklin Cole was an officer of Heller. Plaintiffs have admitted that Cole was acting in his capacity as a Heller employee in all dealings with plaintiffs. (Stipulations of Fact ¶ 21; *see also* Barwick dep. p. 174). Plaintiffs, however, argue Mr. Cole's "substantial" financial interest in Heller's separately incorporated parent, Heller International, places Cole within the "personal stake" doctrine set out in *H & B Equipment Co. v. International Harvester Co.*, 577 F.2d 239, 244 (5th Cir.1977). Plaintiffs contend Cole had an independent personal stake in achieving Heller's illegal objective in that his financial holdings in Heller International would be enhanced as the result of Heller making more money off of Industries.

■ Plaintiffs have not presented a tenable position. The benefits allegedly received by Heller International were not independent of the interests of Heller, but rather were entirely contingent upon the successes of Heller. As defendants point out, any interest that Cole had in the success of the alleged price fixing conspiracy was coextensive with Heller's interest; therefore, for antitrust purposes he could not have conspired with Heller to fix prices. *St. Joseph's Hosp. v. Hospital Corp. of America*, 795 F.2d 948, 956 (11th Cir.1986), *rehearing denied*, 801 F.2d 404 (11th Cir.1986).

Plaintiffs have offered no evidence which would tend to establish illegal horizontal price fixing.

■ A horizontal price fixing conspiracy is a conspiracy to fix prices between or among competitors. *See e.g. United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (Horizontal price fixing occurs when two or more competitors make an arrangement that interferes with the setting of prices by free market forces.) Plaintiffs do not contend that Heller owned or operated a carpet mill in competition with Industries. Instead, plaintiffs contend it was Heller's substantial security agreements with other mills which, in effect, allowed Heller to dictate the price at which those mills could sell their goods. Although their position is not clear, plaintiffs apparently contend Heller pressured other mills into raising the price of their carpet.[8] Even assuming Heller's security holdings in other mills makes Heller a competitor for Sherman Act purposes, plaintiffs do not have standing to complain of such a conspiracy since the alleged wrongful agreements would not result in injury to them. As the Supreme Court has recently stated

> Nor can respondents recover damages for any conspiracy to charge higher than competitive prices in the ... market. Such conduct would indeed violate the Sherman Act, but it could not injure respondents: as petitioner's competitors, respondents stand to gain from any conspiracy to raise the market price.

*Matsushita*, 475 U.S. at 582–586, 106 S.Ct. at 1354–55, 89 L.Ed.2d at 550.

---

8. Plaintiffs maintain Heller's motive for increasing prices of mill goods was to increase factoring commissions.

■ Plaintiffs have offered no evidence which would tend to establish illegal vertical price fixing.

Generally, vertical price fixing is an agreement between a supplier and a customer fixing the resale price of a commodity. *United States v. Parke, Davis & Co.*, 362 U.S. 29, 43, 80 S.Ct. 503, 511, 4 L.Ed.2d 505, 514–15 (1960); *see also Ad–Vantage Tel. Director Consultants, Inc. v. GTE Directories Corp.*, 849 F.2d 1336 (11th Cir. Aug. 27, 1987) (In a typical price maintenance case, a manufacturer produces a product and sells it to a retailer. The manufacturer then attempts, in some way, to control the price that the retailer can charge for the product.); *DuPont Glore Forgan, Inc. v. American Tel. & Tel. Co.*, 437 F.Supp. 1104, 1127 (S.D.N.Y.1977), *aff'd*, 578 F.2d 1367 (2nd Cir.1978), *cert. denied*, 439 U.S. 970, 99 S.Ct. 465, 58 L.Ed. 2d 431 (1978); *Evans v. S.S. Kresge & Co.*, 394 F.Supp. 817, 846–49 (W.D.Pa.1975), *aff'd*, 544 F.2d 1184 (3d Cir.1976), *cert. denied*, 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977).

Defendants argue that no vertical price fixing can be shown since Heller did not provide Industries with a commodity on the condition that Industries could only resell that commodity at a fixed price. Heller provided credit, and Industries did not in turn sell that credit to its customers. Furthermore, even if this credit were resold, there is no indication that Heller set the terms upon which Industries could extend credit to its customers.

In response, plaintiffs take the curious position that Heller used its economic power to fix the resale price of Industries' accounts receivable. Specifically, plaintiffs contend that Heller forced Industries to raise the price of its mill goods and this rise in prices artificially inflated the accounts receivable Heller purchased from Industries.

While it may be true that Heller representatives urged Industries to improve its profitability by lowering costs or raising prices, the problem with plaintiffs' theory is that Industries' sale of carpet to its customers gave rise to or created an account receivable: Industries did not *purchase* the accounts receivable. Accordingly, Heller's purchase of Industries' accounts receivable was not a "resale." Moreover, even if the transactions between the parties could be termed "resales," the pressure allegedly used by Heller, *i.e.*, forcing Industries to raise the price of its mill goods, to indirectly raise the cost of accounts receivable does not reach the level of resale price maintenance. As was held in *Butera v. Sun Oil Inc.*, 496 F.2d 434 (1st Cir.1974), a "producer's tight control over its wholesale prices does not become resale price maintenance merely because retail outlets to which it sells, being highly competitive and selling at low margins, are sensitive to every change in wholesale prices." *Id.*, at 437; *see also Kellam Energy Inc.*, 668 F.Supp. at 887; *Taggart v. Rutledge*, 657 F.Supp. 1420, 1441 (D.Mont. 1987).

Accordingly, defendants' motion for summary judgment as to the alleged price fixing issues is GRANTED.

## THE ALLEGED EXCLUSIVE DEALING ARRANGEMENT

. The third antitrust issue (exclusive dealing) defined in the Court's June 27, 1986, Order is as follows:

> Whether defendants engaged in an unfair trade practice by requiring that plaintiffs and other carpet concerns factor only with defendants as a condition of the factoring agreement.

An exclusive dealing arrangement "require[s] a purchaser not to deal with others as a condition of dealing with the seller. The obvious vice of such an arrangement is that it both restricts the purchaser from looking elsewhere for a more competitive source of supply and excludes the supplier's competitors from the purchaser's business." *Southern Concrete Co.*, 535 F.2d at 318.

The first paragraph of the September 29, 1978, Maturity Factoring Agreement states "The following will confirm the agreement by and between you and WALTER E. HELLER & COMPANY ("Heller") under which we will act as your sole factor...."

The Agreement further provided that it would

continue in effect for one (1) year from the date hereof and from year to year thereafter, but may be terminated by us at any time in the event of a default by you hereunder, or it may be terminated as to future transactions by either party giving the other not less than ninety (90) days advance written notice. Any such notice given by you shall not be effective prior to the end of the original term or the anniversary date of any subsequent one-year term of this Agreement, as the case may be. This Agreement may not be terminated by you until all indebtedness and obligations of yours to us hereunder and under any other existing or future financing arrangements between you and us, or howsoever arising, are fully paid and performed.

Plaintiffs contend the Maturity Factoring Agreement's provision that Heller act as Industries' sole factor violated Section 3 of the Clayton Act and/or Section 1 of the Sherman Act. Heller moves for summary judgment on the following grounds: (1) the Maturity Factoring Agreement is not covered by the provisions of § 3 of the Clayton Act, and (2) plaintiffs have failed to raise a genuine issue of material fact as to whether the alleged exclusive dealing arrangement substantially lessened competition under § 3 of the Clayton Act, or actually restrained trade under the Sherman Act, *in the relevant market.*

Section 3 of the Clayton Act provides: It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies or other commodities ... for use, consumption or resale within the United States ... or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14.

■ Under the Maturity Factoring Agreement, Heller purchased Industries' accounts receivable representing amounts due Industries on account of Industries' sales of carpet to its customers. Heller maintains that its position in this relationship was that of a lender and argues that providing financing is not a sale of a commodity within the meaning of the Clayton Act.

In *United States v. Investors Diversified Services, Inc.,* 102 F.Supp. 645 (D.Minn. 1951), the court held that loans made on the condition that recipients take out hazard insurance with the lender were not tying products under § 3 of the Clayton Act. In that case the court found that Congress intended that the phrase "other commodities" relate back to the terms "goods, wares, merchandise, machinery, supplies" and if these words were given their ordinary meaning they would "not include money which ... is a medium of exchange." *Id.* at 648.

Plaintiffs concede they have found no Clayton Act cases treating credit as money. Nor has the Court found any cases which would support plaintiffs' Clayton Act claims. The Court therefore concludes that money, or the extension of credit, is not a "commodity" for Section 3 purposes. *See also Satellite Financial Planning v. First Nat. Bank,* 633 F.Supp. 386, 399 (D.Del. 1986), *mod. in part on reconsideration,* 643 F.Supp. 449 (1986); *Wendkos v. ABC Consolidated Corp.,* 379 F.Supp. 15, 17–18 (E.D.Pa.1974); L. Schwartz, J. Flynn & H. First, *Free Enterprise and Economic Organization: Antitrust* 667–670 (6th ed. 1983).

Defendants further argue that even if the Court were to conclude that the exclusive nature of the Maturity Factoring Agreement is covered by § 3 of the Clayton Act, they are still entitled to judgment as a matter of law in that plaintiffs have

not submitted evidence of the relevant market in which a substantial amount of competition was foreclosed.

■ An exclusive dealing arrangement is not a *per se* violation of the antitrust laws. *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961), *see Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033, 1036 (5th Cir.1981), *cert. denied*, 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981). Such arrangements may enhance competition. For example, a requirements contract may be of economic advantage to a buyer because it assures supply and affords against price rises; it may also reduce a seller's expenses and provide predictable markets. *Standard Oil Co. of California v. United States*, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). Thus, before any exclusive dealing can be said to have violated either § 1 of the Sherman Act or § 3 of the Clayton Act, it must be shown that a defendant's actions "had a significant anticompetitive effect upon the relevant market." *Satellite Financial Planning Corp.*, 633 F.Supp. at 398; *Kellam Energy Inc.*, 668 F.Supp. at 884. In other words, an exclusive dealing arrangement is illegal "only if [it is] likely to foreclose the entry into a substantial part of the market of products that compete with the products benefitting from the exclusive dealing arrangement." *Chuck's Feed & See Co., Inc. v. Ralston Purina Co.*, 810 F.2d 1289, 1293 (4th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 94, 98 L.Ed.2d 55 (1987), *citing Tampa Electric Co.*, 365 U.S. at 325–29 81 S.Ct. at 627–29; *Standard Oil Co. of California*, 337 U.S. at 314, 69 S.Ct. at 1062; *Standard Fashion Co. v. Magrane–Houston Co.* 258 U.S. 346, 356–57, 42 S.Ct. 360, 362–63, 66 L.Ed. 653 (1922).

In *Tampa Electric*, the Supreme Court set forth a three-step analysis for evaluating the legality of exclusive dealing arrangements under the Clayton Act:

> *First*, the line of commerce, i.e., the type of goods, wares, or merchandise, etc., involved must be determined, where it is in controversy, on the basis of facts peculiar to the case. *Second*, the area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practically turn for supplies.
>
> . . . .
>
> *Third*, and last, the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market. That is to say, the opportunities for other traders to enter into or remain in that market must be significantly limited. . . .

*Tampa Electric*, 365 U.S. at 327–28, 81 S.Ct. at 628, 5 L.Ed.2d at 587.

■ Given this three-step analysis, it is clear that in order to determine whether a substantial share of the competition has been foreclosed, the relevant product and geographic markets must first be determined. "The plaintiff in an antitrust case bears the burden of proof on the issue of the relevant product and geographic markets." *Satellite Television & Associated Resources Inc. v. Continental Cablevision of Virginia, Inc.*, 714 F.2d 351, 355 (4th Cir.1983), *cert. denied*, 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984), *citing Gough v. Rossmoor Corp.*, 585 F.2d 381, 389 (9th Cir.1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979).

> To define a market in product and geographic terms is to say that if prices were appreciably raised or volume appreciably curtailed for the product within a given area, while demand held constant, supply from other sources could not be expected to enter promptly enough and in large enough amounts to restore the old price and volume.

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C.Cir. 1986), *cert. denied*, 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987), *quoting* L. Sullivan, *Antitrust* § 12, at 41 (1977).

In determining the relevant product market, a court must consider all commodities which are reasonably interchangeable for the purposes for which they are produced. *United States v. DuPont & Co.*, 351 U.S. 377, 394–95, 76 S.Ct. 994, 1006–07, 100

L.Ed. 1264 (1956). In other words, "the definition of the 'relevant [product] market' rests on a determination of available substitutes." *Rothery Storage & Van Co.*, 792 F.2d at 218; *see L.A. Draper & Son v. Wheelabrator–Frye, Inc.*, 735 F.2d 414, 423 (11th Cir.1984). Within certain product markets, there may exist economically significant sub-markets which themselves constitute relevant product markets. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d (1962). The criteria utilized in determining whether a sub-market exists include "examining such practical indicia as industry or public recognition of the sub-market as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*

In determining the relevant geographic market, the "[a]nticompetitive effect in an exclusive dealing context is measured in the seller's market...." *Kellam Energy, Inc.*, 668 F.Supp. at 885 n. 33. The seller's market is the area in which that seller effectively competes with other sellers. *Tampa Electric*, 365 U.S. at 331–32, 5 L.Ed.2d at 589. Thus, in stating that "the area of effective competition ... must be charted by careful[ly] select[ing] the market area in which ... the purchaser can practicably turn for supplies." *Id.*, 365 U.S. at 327, 5 L.Ed.2d at 587, the Supreme Court indicated that the relevant geographic market includes the area in which other suppliers that were willing to compete for the consumer's business operated.

In moving for summary judgment, defendants have submitted an affidavit of an expert economist, Jesse W. Markham. In his affidavit, Mr. Markham opined that factoring was interchangeable with other types of commercial credit, and therefore concluded that the relevant product market included all commercial credit. (Markham Aff. ¶¶ 6 and 8). Given modern means of transportation and communication and the international character of modern banking and finance, taken together with plaintiffs' previous actions in searching for credit, Mr. Markham concluded that the relevant geographic market, *i.e.*, the area in which lenders compete and to which Industries practicably had access, included, "at minimum, the United States and Canada and probably the entire free world." (*Id.* at ¶ 9).

After nearly four years of discovery, plaintiffs respond with the affidavits of E.T. Barwick and Sandy Sobelman which state that factoring services are unique in that they provide a combination of credit and collection services (Sobelman Aff. ¶ 5(B), (D) and (E) and ¶ 6), and that a distinct market exists for the factoring of accounts receivable in the tufted carpet industry in the Southeast United States. (Barwick Aff. ¶ 14).

Even if the Court were to assume that the relevant product market is factored accounts receivable, and not commercial credit, plaintiffs apparently claim there exists an economically significant sub-market within the factoring receivables product market. Specifically, plaintiffs contend the sub-market to be factoring receivables *in the tufted carpet industry.*

Plaintiffs, unfortunately, have not submitted evidence which would support this narrowly defined submarket.[9] Plaintiffs have offered no evidence showing how tufted carpet manufacturers' utilization of factoring services differs from that of factoring customers in industries such as other textile, apparel, and lumber industries. Nor have plaintiffs presented evidence showing a specific class of vendors that specializes in factoring to the tufted

---

9. Notwithstanding plaintiffs' interpretation of, and reliance on, *Henderson Broadcasting Corp. v. Houston Sports Ass'n.*, 647 F.Supp. 292 (S.D. Tex.1986), the Court concludes that since an antitrust plaintiff has the ultimate burden of proving the relevant product market, then such plaintiff also bears the burden, for summary judgment purposes, of pointing out the existence of genuine issues of material fact when the existence of its own defined product market is called into doubt. *See e.g., Celotex Corp. v. Catrett*, 417 U.S. 317, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265, 275 (1986) ("[T]he burden on the moving party may be discharged by 'showing'— that is, pointing out to the District Court—that there is an absence of evidence to support the nonmoving party's case.").

carpet industry.[10] *Cf. Satellite Financial Planning Corp.*, 633 F.Supp. at 398 ("No one lender can survive in a 'market for financing a particular product' if it does not remain competitive with the credit markets as a whole."). Finally, plaintiffs have submitted no evidence supporting their contention that factors having no experience with the carpet industry are not able to effectively compete for the carpet mill factoring business. Accordingly, the Court concludes plaintiffs have failed to raise a genuine issue of material fact as to the existence of a significant relevant product market consisting only of factored receivables in the tufted carpet industry.

█ Assuming *arguendo* plaintiffs have sufficiently supported their narrowly defined product market, the Court further concludes plaintiffs have failed to support their alleged relevant geographic market.

In defining the relevant market to be the factoring of accounts receivable in the tufted carpet industry in the Southeast United States, plaintiffs have limited the relevant geographic market to the Southeast United States. Plaintiffs' definition of the relevant geographic market, however, overlooks the basic teaching of *Tampa Electric.*

In *Tampa Electric*, the plaintiff brought an action challenging the legality of a 20–year requirements contract. Under the agreement, the defendant coal company was obligated to supply the requirements of coal for two power generating stations in Tampa, Florida. The trial and circuit courts determined the relevant geographic market to be the market where the customer utility was located, which was defined as consisting of peninsular Florida. Those courts found that the requirements contract violated § 3 of the Clayton Act since it was estimated that the subject contract would account for 18% of all purchases of coal in the customer's market. *Tampa Electric*, 365 U.S. at 330–31, 81 S.Ct. at 629–630, 5 L.Ed.2d at 588–89.

The Supreme Court reversed the lower courts, finding that the requirements contract did not foreclose a substantial volume of competition. The Court's holding was based upon the fact that when the focus was placed on "the market area in which the seller operates, and to which the purchaser can· practicably turn for supplies" (*i.e.*, the area of effective competition) *Id.*, 365 U.S. at 328, 81 S.Ct. at 628, 5 L.Ed.2d at 587, the geographic market included the location of the 700 coal producers that could reasonably service the Florida power stations. *Id.*, 365 U.S. at 331–32, 81 S.Ct. at 630, 5 L.Ed.2d at 589. Thus, when viewed in the scope of the proper geographic market, the requirements contract foreclosed less than 1% of the market which was insufficient to violate § 3 of the Clayton Act. *Id.*, 365 U.S. at 333, 81 S.Ct. at 631, 5 L.Ed.2d at 590.

In narrowly defining the relevant geographic market as the Southeastern United States, plaintiffs attempt to limit the market to an area in which Industries was located. Such a definition clearly will not suffice under *Tampa Electric.* Plaintiffs' geographic market definition would be sufficient only if evidence were presented showing this to be the area of effective competition. Plaintiffs, however, have failed to present evidence regarding the area in which Heller's competitors operated. More importantly, plaintiffs have not even attempted to show that Industries, as a practical matter, could not seek factoring services from suppliers located outside the Southeastern United States.

All that is before the Court is the bald statement of E.T. Barwick alleging that a distinct market exists in the Southeastern United States.

An expert's affidavit submitted in opposition to a motion for summary judgment must set forth specific facts from the record to support its conclusions. *Evers v. General Motors Corp.*, 770 F.2d 984 (11th Cir.1985); *United States v. Various Slot Machines*, 658 F.2d 697,

---

**10.** It is noted that Heller's factoring services were not limited to clients in the carpet industry

(Wishner 6/28/84 dep. pp. 70–71).

700–01 (9th Cir.1981); *Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 672–73 (D.C.Cir.1977). Theoretical speculation, unsupported assumptions and conclusory allegations advanced by an expert are neither admissible at trial, *see, e.g., American Bearing Co. v. Litton Industries, Inc.,* 540 F.Supp. 1163, 1171–75 (E.D.Pa.1982), *cert. denied* 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984), nor are they entitled to any weight when raised in opposition to a motion for summary judgment. *See Evers, supra, Various Slot Machines, supra* and *Merit Motors, supra.*

*Reazin v. Blue Cross and Blue Shield of Kansas, Inc.,* 663 F.Supp. 1360, 1479 (D.Kan.1987).

Accordingly, the Court concludes plaintiffs have failed to raise a genuine issue of material fact as to the existence of a relevant geographic market consisting only of the Southeastern United States.

Finally, even if the Court were to determine that plaintiffs have adequately set out the parameters of the relevant product and geographic markets, plaintiffs have failed to present evidence showing that the competition foreclosed by the Maturity Factoring Agreement constituted a substantial share of the relevant market. Specifically, in the exclusive dealing sections of their "revised" response and surreply, plaintiffs do not present any statistical evidence reflecting the amount of competition foreclosed.

Accordingly, the Court finds that under the three-step analysis of *Tampa Electric,* plaintiffs have not raised genuine issues of material fact as to the illegality of the Maturity Factoring Agreement under § 3 of the Clayton Act.

Plaintiffs having failed to show a substantial lessening of competition under the Clayton Act, the Court also concludes plaintiffs can not meet the standard of § 1 of the Sherman Act which requires a showing of an actual restraint of trade. *See e.g. Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 512 F.2d 1264, 1275 (9th Cir.1975) ("A greater showing of anti-competitive effect is required to establish a

Sherman Act violation in exclusive-dealing or requirements contracts cases. The existence of this heavier burden is rooted in the language of the two statutes; the Sherman Act speaks of actual restraints of trade while § 3 of the Clayton Act speaks of effects of arrangements which may substantially lessen competition or tend to create a monopoly."); *American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1250 (3d Cir.1975); *Taggart,* 657 F.Supp. at 1443.

Defendants' motion for summary judgment as to the alleged exclusive dealing arrangement issue is therefore GRANTED.

## THE ALLEGED MONOPOLIZATION CLAIMS

The final antitrust issue (monopolization) defined in the Court's June 27, 1986, Order is as follows:

Whether defendants possessed monopoly power in the relevant market by exercising sufficient control over manufacturers that held a monopoly share of the market.

The two elements of illegal monopolization under § 2 of the Sherman Act are: (1) possession of monopoly power in the relevant product and geographic market; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident. *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *St. Joseph's Hosp.,* 795 F.2d at 957; *American Key Corp. v. Cole National Corp.,* 762 F.2d 1569 (11th Cir.1985). The elements of an attempt to monopolize are: (1) specific intent to accomplish the illegal result (monopolization); and (2) a dangerous probability that the firm will succeed in monopolizing the market. *Ad–Vantage Telephone Director Consultants, Inc. v. GTE Directories Corp.,* 849 F.2d 1336 (11th Cir.1987), *citing Spectrofuge Corp. v. Beckman,* 575 F.2d 256, 276 (5th Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979).

Defendants move for summary judgment on the grounds that Heller's 3.1% share of the United States commercial credit market is too small to suggest that Heller possessed monopoly power or a dangerous probability of success in achieving monopoly power. Plaintiffs respond by asserting Heller attempted to monopolize the market consisting of the provision of factoring credit to manufacturers of tufted carpeting in the Southeastern United States.

"[A] section 2 plaintiff attempting to prove either completed monopolization or an attempt to monopolize must provide the jury with sufficient evidence to permit it to define the relevant geographic and product market." *Ad–Vantage Telephone Director Consultants, Inc.*, 849 F.2d 1336 quoting *In re Municipal Bond Reporting Anti–Trust Litigation*, 672 F.2d 436, 441 (5th Cir.1982); *Dimmitt Agri Industries, Inc. v. CPC International Inc.*, 679 F.2d 516, 525 (5th Cir.1982), *cert. denied*, 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983). As has been previously pointed out in the section of this Order discussing the alleged exclusive dealing arrangement, plaintiffs have failed to meet their burden regarding proof of their alleged relevant geographic and product market. *See supra* pp. 1345–1346. This failure to adequately support their definition of the relevant market entitles defendants to summary judgment on any monopolization claims.

 Alternatively, even if the Court were to determine plaintiffs' evidence is sufficient to raise a triable issue concerning the definition of the relevant market, the Court, for the reasons stated below, also concludes plaintiffs have failed to present admissible evidence showing Heller's share of the relevant market as defined by plaintiffs. The failure to provide evidence reflecting Heller's share of the market results in there being no triable issue regarding proof of a dangerous probability of Heller achieving monopoly power.

In their revised response, plaintiffs contend that Heller's share of factoring credit to manufacturers of tufted carpet in the Southeastern United States was 16%. In fixing the market share at 16%, plaintiffs relied on the following figures:

(1) Between 1975 and 1980, Heller's total factoring volume for carpet mills in the United States ranged between $233.1 million and $297.7 million with an average annual volume of $256.0 million. (Markham Aff. ¶ 18).

(2) Between 1978 and 1980, the estimated total volume of carpet shipped in the United States ranged between $5.498 billion and $5.908 billion, an average $5.69 billion annually. (Markham Aff. ¶ 17).

(3) Of this sales volume, the Southeastern United States carpet mills accounted for $3.98 billion or approximately 70%.

(4) The Southeastern carpet mills typically factored a minimum of 30% to 40% of their receivables.

Using these figures, plaintiffs determined that the accounts factored by the Southeastern mills amounted to $1.6 billion (40% of $3.98 billion), and Heller's share of this market was 16% ($.256 billion of $1.6 billion).

As defendants point out, plaintiffs' market share determination is flawed for two reasons. First, there is no evidence in the record which would support plaintiffs' assertion that Southeastern carpet manufacturers accounted for 70% of all carpet shipments. Secondly, the $256.0 million figure used to reflect Heller's factoring volume is the *total* Heller factoring volume for carpet mills. In other words, the figure does not reflect Heller's factoring volume in only the Southeastern United States; the figure includes Heller factored receivables for carpet mill clients located in California, Texas, New York, and Missouri. (*See* plaintiffs' Exhibit # 19). Accordingly, the Court finds that plaintiffs can not support their assertion that Heller's share of the market was 16%.[11]

11. In their surreply, plaintiffs retreat from their earlier market share analysis and use completely new figures to set Heller's market share at 10 to 25%. Given that these figures were introduced for the first time in the surreply, the Court will not allow plaintiffs to rely on these figures to defeat defendants' motion for summary judgment. Nevertheless, the Court notes that plaintiffs' figures reflecting Heller-factored receivables include receivables factored not only

Accordingly, defendants' motion for summary judgment is GRANTED as to the alleged monopolization issues.

## THE ALLEGED VIOLATION OF O.C.G.A. § 13–8–2

■ The Court also defined the following issue in its June 27, 1986 Order: .

Whether any of the agreements between Barwick Industries and Heller after January 1, 1978 was a general restraint of trade and therefore violated the public policy of the State of Georgia and whether O.C.G.A. § 13–8–2 provides either plaintiff with a cause of action for damages against Heller.

O.C.G.A. § 13–8–2 in relevant part provides:

(a) A contract which is against the policy of the law cannot be enforced. Contracts deemed contrary to public policy include but are not limited to:

. . . .

(2) Contracts in general restraint of trade;

Defendants move for summary judgment . as to this issue on a number of grounds. The most persuasive argument presented is defendants' contention that § 13–8–2 merely declares certain contracts unenforceable and does not confer any right to recover damages. *See Hanley v. Savannah Bank & Trust Co.,* 208 Ga. 585, 68 S.E.2d 581 (1952); *Jones v. Faulkner,* 101 Ga.App. 547, 114 S.E.2d 542 (1960). While plaintiffs attempt to distinguish the above cited cases from the case at bar, they have cited no authority which would support their position that money damages can be had under O.C.G.A. § 13–8–2. Accordingly, defendants' motion for summary judgment as to this issue is GRANTED.

## INTEREST RATE CLAIMS

■ Plaintiffs' agreements with Heller required them to pay interest at a certain number of percentage points above the "prime rate" of the First National Bank of

Chicago ("First Chicago"). Plaintiffs claim Heller's computation of the interest rate was improper because such computation was based on First Chicago's "corporate base rate" rather than First Chicago's "prime rate." Accordingly, the Court in its June 27, 1986, Order set out the following three issues: .

Contract: Whether defendants breached the factoring and related agreements by computing interest charges using a corporate base rate plus points instead of the prime rate plus points.

. Tort: Whether defendants knowingly misrepresented the rate of interest charged under the contracts entered into between the parties by representing that the rate of interest was based on the Prime Rate of First National Bank of Chicago plus points and instead determining the rate of interest using the Corporate Base Rate plus points. Whether the alleged misrepresentations were made with the intent that plaintiffs would rely on them. Whether plaintiffs justifiably relied on defendant's representations and were thereby injured.

Civil RICO: Whether defendants engaged in a pattern of racketeering activity by using United States Mail in a scheme to defraud plaintiffs (1) by computing interest based on a Corporate Base Rate plus points instead of the prime rate plus points. . . .

Defendants move for summary judgment as to these issues on the grounds that (1) any reasonable person in plaintiffs' position would have understood that the rate of interest would be based on First Chicago's announced rate which was referred to throughout the financial community as its "prime rate"; (2) there is no evidence that the "corporate base rate" was not in fact a "prime rate," and absent such a difference, the nomenclature applied to that rate in internal First Chicago communications is immaterial; and (3) plaintiffs' fraud and RICO claims are not supported by any evi-

in the United States, but also in Canada. Furthermore, plaintiffs claim that their evidence shows that 20% of Heller's total volume of factoring receivables was related to clients in

the *carpet industry;* however, plaintiffs do not break down the term "carpet industry" which defendants contend includes suppliers, manufacturers, and distributors.

dence of an intent on defendants' part to defraud plaintiffs.

The agreements entered into between the parties referred to the interest rate which would be charged as follows:

(1) Secured Loan Agreement (September 29, 1978): "to bear interest on the unpaid principal balance thereof from its date at the rate of 4 points in excess of the annual percentage rate (the "Prime Rate") charged to prime commercial borrowers on unsecured indebtedness of ninety-day maturities by the First National Bank of Chicago...." (Defendants' Exhibit # 5 p. 5).

(2) Maturity Factoring Agreement (September 29, 1978): "You agree to pay us interest ... at a rate per annum (meaning 360 days) equal to three percent (3%) plus that rate of interest quoted from time to time by The First National Bank of Chicago to its most credit-worthy corporate borrowers on ninety (90) day unsecured loans (commonly known as its "prime rate")." (Defendants' Exhibit # 6 § 4.2).

(3) Collateral Note ($17.5 million; September 29, 1978): "Interest from the date hereof at a rate of 4 points over First National Bank of Chicago's prime...." (Defendants' Exhibit # 8).

(4) Collateral Note ($3,465,905.23; September 29, 1978): "interest from the date hereof at the rate of 2 points over First National Bank of Chicago's prime...." (Defendants' Exhibit # 9).

(5) Collateral Note (# 3.5 million; April 9, 1979): "interest per annum (meaning 360 days) equal to 3% plus the prime rate of interest from time to time quoted by The First National Bank of Chicago to its most credit-worthy borrowers." (Defendants' Exhibit # 11).[12]

Defendants argue that in determining the interest rate applicable to the loan agreements, Heller equated First Chicago's announced rate to be the appropriate "prime rate." Defendants point out that while First Chicago internally called its announced rate the "corporate base rate," everyone else in the financial and business communities referred to that rate as the "prime rate." For example, periodicals such as the *Wall Street Journal, American Banker, Chicago Tribune, U.S. News and World Report,* and *New York Times* all referred to First Chicago's announced rate as its "prime rate." (Defendants' Exhibit # 24) Additionally, officials at First Chicago were aware that the announced rate was referred to as First Chicago's "prime rate." (Thomas dep. pp. 21–23).[13]

The Heller employee in charge of monitoring changes in First Chicago's "prime rate," Leon Gawron, testified that when he became aware of changes in First Chicago's announced interest rate via the media or computer terminal, he or another Heller employee would call First Chicago to confirm the change. In confirming the change in rates, Gawron would ask First Chicago for its "prime rate," and First Chicago would respond with a number. (Gawron dep. pp. 96–104). Moreover, plaintiffs' accountants also verified the accuracy of the interest rates charged by Heller when they telephoned First Chicago and requested information regarding First Chicago's "prime rate" for specific dates. (Mott dep. pp. 43–45).

Plaintiffs point to a few specific instances where First Chicago made loans to borrowers at rates which were less than First Chicago's announced rate. The Court, however, finds that the evidence supports the conclusion that the meaning of the term "prime rate," as used in the parties' loan agreements, is limited to the rate at which First Chicago disclosed to the public whether through the financial media or through information given in response to telephonic requests. In other words, the Court finds that First Chicago's "corporate base rate" was its "prime rate."

There being no evidence which would show that Heller, at any relevant time,

12. All three Collateral Notes provided that "the holder hereof shall have all of the rights specified in that certain Secured Loan Agreement dated September 29, 1978."

13. It is noted that First Chicago's announced rate generally tracked the published "prime rates" of other large financial institutions. (*Compare* Defendants' Exhibits 24 and 28).

charged an interest rate (excluding the contracted for "plus points") which was above First Chicago's publicly disclosed "corporate base rate"/"prime rate," the Court holds that defendants are entitled to summary judgment as to plaintiffs' breach of contract claim.

Further supporting the above holding, at least insofar as the Secured Loan Agreement and Maturity Factoring Agreement are concerned, is the fact that plaintiffs have failed to point to a single unsecured 90–day loan made by First Chicago at an interest rate lower than the "corporate base rate." To the contrary, the evidence suggests that every 90–day loan made by First Chicago was at an interest rate at or above the "corporate base rate." (*See* Defendants' Exhibit 27; Thomas dep. pp. 29–32).

Accordingly, defendants' motion for summary judgment as to the interest rate contract claim is GRANTED.

Defendants also argue they are entitled to summary judgment as to plaintiffs' tort and RICO claims on the grounds that plaintiffs can present no evidence from which a jury could reasonably infer intent to defraud on the part of Heller. In response, plaintiffs contend the deposition of Franklin Cole shows that genuine issues of material fact exist as to whether there was knowing misrepresentation of interest rates on the part of Heller.

The full text of plaintiffs' argument is as follows:

> Defendant Cole, when questioned whether Heller had banking relationships with First Chicago, indicated that during his tenure, Heller had a line of credit which was at "prime"—his words. Mr. Cole did not remember much else about the rate. At no time did he use the term "corporate base rate"—no doubt because Heller did not borrow at corporate base rate-pegged rates, but instead at First Chicago's *lowest* commercial rate, *viz* "prime." (Code Deposition taken November 24, 1986, pages 676, 677, appendix 36D).

Plaintiffs' revised response in opposition to defendants' motion for summary judgment, pp. 88–89.

Plaintiffs' position in no way presents a genuine issue of material fact with regard to Heller's alleged intent to defraud. First there is absolutely no evidence which would support plaintiffs' contention that the "prime rate" charged to Heller was lower than First Chicago's "corporate base rate" at that time. More importantly, Mr. Cole testified that he was not aware of any instance where First Chicago extended credit or made a loan to Heller at a rate of interest which was lower than its published prime rate. (Cole dep. p. 676, taken 11/24/86). Finally, Mr. Cole's previous testimony shows that he considered the prime rate to be the rate which the bank published (Cole dep. p. 324, taken 3/13/84), and that he did not know of any time at which Heller borrowed money from First Chicago at a rate less than posted prime. (Cole dep. p. 186, taken 3/13/84). *See Blount Financial Services, Inc. v. Walter E. Heller & Co.*, 819 F.2d 151, 153 (6th Cir.1987) (Affirming dismissal of plaintiff's RICO claims since plaintiff "was in as good a position as Heller to discover the 'true' prime rate.").

Plaintiffs having offered no evidence which would support their allegations of fraud, the Court will GRANT defendants' motion for summary judgment as to the interest rate tort and RICO claims.

### THE "UNCLAIMED CREDITS" ALLEGATIONS

In conducting its factoring operation, Heller would occasionally receive a payment from a customer of a factoring client which Heller could not apply to the appropriate factored invoice because Heller allegedly was not provided with sufficient information to permit it to identify the relevant invoice. If Heller's efforts to identify the invoice were unsuccessful, the payment was transferred to an "unclaimed credits" account and eventually taken into income. Thus, these transfers of payments into an "unclaimed credits" account resulted in instances where a Heller-factored client such as Industries did not receive credit for the

**1352**

payments made by that factored client's customers. The Court assumes the Heller-factored client lost credit either because the payment in fact belonged to the factoring client (*i.e.,* the payment was on a non-factored invoice) or the payment related to an account receivable purchased by Heller on a "client risk" basis which resulted in Heller subsequently seeking payment from the client. *See supra* fn. 1.

With respect to plaintiffs' claims concerning "unclaimed credits," the Court included in its June 27, 1986, Order the following issues:

> Tort: Whether plaintiffs were defrauded by defendants' alleged practice of placing payments on unidentified receivables into an unapplied cash account which payments if they remained unidentified were then transferred to an unclaimed credit account and which unidentified payments were eventually considered income and profit of Heller.

> RICO: Whether defendants engaged in a pattern of racketeering activity by using the United States Mail in a scheme to defraud plaintiffs ... by placing payments on unidentified receivables into an unapplied cash account which payments if they remained unidentified were then transferred to an unclaimed credit account and which unidentified payments were eventually considered income and profit of Heller.

Defendants move for summary judgment as to these Court-defined issues on two grounds. First, defendants maintain there is no evidence that anything was misrepresented to or concealed from plaintiffs with regard to Heller's maintenance of an unclaimed credits account. Second, defendants contend there is no evidence that plaintiffs were damaged as the result of Heller's maintenance of an unclaimed credits account in that plaintiffs have never identified a single unclaimed credit that should have been, but was not credited to Industries.

To prevail in an action for fraud under Georgia law, the plaintiff must show that the defendant made a false representation of material fact. *Strickland v. Levy's of Savannah, Inc.,* 112 Ga.App. 665, 145 S.E.2d 831 (1965). To prevail in an action brought pursuant to 18 U.S.C. § 1964(c), the civil RICO plaintiff must prove that the defendant engaged in conduct which could deceive persons of reasonable prudence and comprehension. *United States v. White,* 673 F.2d 299, 302 (10th Cir.1982). Moreover, under both theories of recovery the plaintiff must also prove he suffered damage or injury as the result of the fraud. *See Sedima, S.P.R.L. V. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (If the defendant engages in a pattern of racketeering activity in a manner forbidden by 18 U.S.C. § 1962, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under § 1964(c)); *Stovall Tire & Marine, Inc. v. Prance Body & Fender Works,* 179 Ga.App. 483, 347 S.E.2d 313 (1986) ("Fraud without damage, or damage without fraud, gives no cause of action, but when these two concur an action lies."); *Brown v. Bowden,* 179 Ga.App. 626, 628, 347 S.E.2d 356 (1986).

Defendants argue plaintiffs have never articulated exactly what misrepresentations or concealment on the part of Heller took place with respect to unclaimed credits. In response, plaintiffs make the general arguments that given the enormity of Heller's factoring volume it was not practical to attempt to verify each transaction, and Heller's monthly statements were virtually incomprehensible such that they could never be reconciled with client mill documentation.

■ Having reviewed plaintiffs' response in the most favorable light, the Court finds that there *may* be genuine issues of material fact as to whether Heller concealed information reflecting the nature and origin of the receivables contained in the unclaimed credits account. The Court, however, must conclude that defendants are entitled to summary judgment since plaintiffs have not shown that they have suffered injury or damage as the result of Heller's maintenance of the unclaimed credits account.

Defendants have repeatedly sought to determine which unclaimed credits plaintiffs claim they are entitled. In its June 14, 1985, and July 17, 1986, discovery requests, defendants asked for information about plaintiffs' claims regarding payments made on behalf of Industries that were not properly credited against Industries' indebtedness to Heller. In moving for summary judgment defendants, in essence, again seek information concerning the basis of plaintiffs' unclaimed credits claims. In response to the interrogatories and motion for summary judgment, however, plaintiffs fail to identify a single unclaimed credit as belonging to them. Nor have plaintiffs disputed defendants' contention that plaintiffs have been provided with all documentation needed to determine whether any of the unclaimed receivables held by Heller in fact belong to Industries.

Plaintiffs simply have not offered any evidence showing they incurred injury as the result of Heller's unclaimed credits practices. Plaintiffs' bare allegation that they sustained injury when a customer's payment could not be associated with an Industries' invoice, without proof of any instance of actual damage, will not suffice to defeat defendants' motion for summary judgment.

Accordingly, defendants' motion for summary judgment as to the unclaimed credits issues is GRANTED.[14]

### THE APRIL 1979 LOAN AND PERSONAL GUARANTY

The only issue left regarding plaintiffs' cause of action is plaintiffs' contention that Heller acted improperly with respect to the application of funds to the April 1979 note. Plaintiffs claim breach of contract and a RICO violation. The vast majority of the time spent by the parties in addressing Heller's alleged improprieties deals with plaintiffs' contention that Heller's actions in using factored receivables to satisfy Industries' overdue interest, rather than using said receivables to satisfy the April 1979 note, effectively released Barwick from his personal guaranty.

The Court determines it best to hold an oral hearing as to the issues relating to the April 1979 note. In addition to the arguments raised in the briefs, the Court directs that the parties be prepared to address the following issues: (1) Whether Industries agreed to the suspension of the paydown; (2) Whether or not Industries agreed to the suspension, how has Industries suffered damage; and (3) Which state's law, Georgia or Illinois, is applicable to the issue regarding Barwick's guaranty.[15]

### DEFENSES TO HELLER'S COUNTERCLAIM

The Court also determines it best to hold an oral hearing with regard to Heller's motion for partial summary judgment on the defenses raised by plaintiffs to Heller's Counterclaim. The Court will be willing to hear any argument set forth by the parties so long as each argument is timely and has a legal and factual basis.

ACCORDINGLY, defendants' motion for summary judgment is GRANTED on every issue except the issues relating to plaintiffs' claims with respect to the application of funds to the April 1979 note which was guaranteed by Barwick. The Court will hold an oral hearing as to these remaining issues as soon as possible. Likewise, the Court determines it best to hold an oral hearing with regard to Heller's motion for partial summary judgment on the defenses raised by plaintiffs to Heller's Counterclaim.

---

14. Given that the Court has determined that defendants are entitled to summary judgment with regard to all issues discussed so far in this order, it is unnecessary to discuss the following Court-defined issue: "Whether E.T. Barwick has standing to bring certain claims at issue in the case." (*See* June 27, 1986, Order ¶ 11).

15. Upon reviewing the relevant law, the Court generally agrees with the parties that the law of Georgia and Illinois generally track each other as to this issue.