Mahlon Daniel BROWDER, Jr., Plaintiff,

v.

GENERAL MOTORS CORPORATION;
State Farm Mutual Automobile Insurance Company, Defendants.

Civil Action No. 96–D–789–N.

United States District Court,
M.D. Alabama,
Northern Division.

Jan. 27, 1998.

James H. Tipler, Franklin J. Tipler, Jr., Andalusia, AL, Mal S. Duncan, Atlanta, GA,

Mark J. Christensen, Andalusia, AL, for Plaintiff.

Susan Shirock DePaola, Montgomery, AL, for Blue Cross.

D. Alan Thomas, Gregory L. Schuck, Birmingham, AL, R. Chris Harvey, Kurt W. Meaders, Dallas, TX, Gary L. Weaver, Andalusia, AL, for Defendants.

## *MEMORANDUM OPINION AND ORDER*

DE MENT, District Judge.

Before the court is the November 26, 1997 Recommendation of Magistrate Judge Vanzetta Penn McPherson ("Recomm.") regarding Defendant General Motors Corporation's ("GM") Motion To Strike filed October 20, 1997. GM seeks to have stricken Plaintiff's theories of defect that were previously unpled or undisclosed. The Magistrate Judge recommends that GM's Motion To Strike be granted; specifically that Plaintiff not be allowed to proceed with his theories of defect related to: (1) seat-belt anchorage points; (2) door latch defects; and (3) window glazing.

Plaintiff filed his Objections To The Findings And Recommendation Of The Magistrate Judge ("Pl.'s Obj.") on December 8, 1997, along with an "informal typewritten transcript" of the hearing held before the Magistrate Judge on November 21, 1997 ("Hearing").[1] GM filed a Response to Plaintiff's Objections ("GM's Resp.") on December 15, 1997. Plaintiff then filed a Reply to GM's Response ("Pl.'s Reply") on December 18, 1997 along with a Motion For Leave To Amend his Complaint. On the same date, Plaintiff's counsel sent a lengthy personal letter to the court reiterating the exact arguments articulated in Plaintiff's Reply.

After careful consideration of the Recommendation of the Magistrate Judge, the arguments of counsel, a thorough and independent review of the record as a whole, and a review of applicable law, the court finds that said Recommendation is well taken and is due to be adopted, approved and affirmed.

Still pending is GM's Motion For Summary Judgment, filed August 25, 1997. Plaintiff filed pleadings in opposition to GM's Motion on November 14, 1997 and November 18, 1997. For the reasons discussed below, in addition and in the alternative to adopting the Magistrate Judge's Recommendation, the court finds that GM's Motion For Summary Judgment on all of Plaintiff's theories of defect is due to be granted. Finally, there being no issues remaining for resolution, the court further finds that Blue Cross/Blue Shield's Complaint In Intervention, filed May 20, 1997, is due to be dismissed, and this action is due to be dismissed in its entirety.

## *JURISDICTION*

The court properly exercises jurisdiction pursuant to 28 U.S.C. § 1332 (diversity). The parties do not contest personal jurisdiction or venue.

## I. FACTUAL SUMMARY [2]

At approximately 3:00 a.m., the morning of September 3, 1994, Browder was a passenger in a 1994 Chevrolet K–5 Blazer designed and manufactured by GM. The driver of the vehicle was a friend of Browders named Tony Pierce. The two were traveling south on United States Highway 31 in Conecuh County, Alabama. The weather was clear and dry, and the highway was an unlit, rural, two lane asphalt road. A portion of Highway 31 approximately one-quarter of a mile from its intersection with County Road 71 had previously been closed for construction and had only recently reopened. Pierce's understanding was that the purpose of the construction was to straighten out several dan-

---

1. On the same date, Plaintiff filed a Motion For Sanctions against GM, which the Magistrate Judge denied on December 9, 1997. On December 12, 1997, Plaintiff filed an Objection To Magistrate's Denial Of Plaintiff's Motion For Sanctions. After careful consideration of the arguments of counsel and relevant law, the court finds that Plaintiff's Objection To Magistrate's Denial Of Plaintiff's Motion For Sanctions are due to be overruled.

2. This factual summary is substantively identical to that articulated in the court's November 24, 1997 Memorandum Opinion And Order granting former Defendant State Farm's Motion For Summary Judgment and dismissing Plaintiff's claims against any fictitious Defendants.

gerous curves in the road. Pierce had not been on Highway 31 since it had reopened.

As Pierce was driving on the recently reopened stretch of road, he noticed that two of the curves had been straightened out by the construction. One of the curves near the end of the construction though, had not yet been straightened. At the point where the curve began, there was a bump in the road where the old pavement met the new pavement.

As Pierce entered into this part of the roadway, the Blazer ran off the right-hand side of the road. Pierce "snatched it back," and then "lost control" of the vehicle. (State Farm Ex. To Mot. For Summ. J., Pierce Depo. at 17.) The Blazer slid sideways, overturned, and eventually came to a stop in an upright position, on the left-hand side of the road. The vehicle was facing north, the opposite direction it had been traveling.

Pierce was still inside the vehicle with no significant injuries. Browder was ejected from the vehicle during the accident, and was found about ten to twenty yards away. He suffered severe injuries, including partial paralyzation, and filed suit against GM alleging that the Blazer was defective. GM contends that the Blazer was not defective, that the accident was due to Pierce's driving, and that Browder's injuries resulted from his failure to wear a seat-belt.

Browder's Complaint, as amended, set forth four distinct Counts. Count I alleged wantonness against the driver of the vehicle, Tony Pierce. Browder contended that as a result of Pierce's "willful or wanton misconduct in the operation of his vehicle, the vehicle left the roadway and overturned." (Compl.¶ 11.) Pierce, however, is no longer a Defendant in this action and Count I is no longer viable.[3]

Count II alleged negligence against "John Does 11 through 30" involving the portions of the roadway upon which Plaintiff was traveling. Count IV was against State Farm. These counts were dismissed in the court's November 24, 1997 Memorandum Opinion and Order granting State Farm's Motion For Summary Judgment.

Accordingly, Count III is all that remains for the court's disposition. Count III alleges that the Blazer was "unreasonably dangerous because of its propensity to roll over." (Compl.¶ 19.) Browder alleges that this unreasonably dangerous condition was a proximate cause of his injuries. (*Id.* ¶ 20.) Plaintiff has not amended his Complaint to include any other theory of defect other than instability.[4]

## II. PROCEDURAL HISTORY

In a February 21, 1996 interrogatory, GM requested that Plaintiff "[d]escribe completely and in exact detail each and every defect, either in design, manufacture, or otherwise which you claim made such vehicle 'defective.'" (*See* Recomm. at 4.) Plaintiff responded that in addition to the instability claim articulated in his Complaint:

> the design of various component parts of the vehicle, individually and in concert with the other components, failed to restrain me and contain me in the occupant compartment of the vehicle and allowed me to be ejected from the vehicle, thus causing severe injury to me and enhancing injuries I might have otherwise suffered. Further details of the defective nature of the vehicle will be provided in supplementary responses and in depositions of experts retained for use at trial.

(*See* Recomm. at 4.)

These "further details" were "provided" as follows: (1) in Plaintiff's June 5, 1997 Motion To Compel, Plaintiff stated that the subject matter of this action was the "front seat

---

3. Pierce and Browder entered into a settlement agreement, the validity of which was later disputed. By an Order entered May 20, 1997, the portion of this action involving the settlement agreement between Plaintiff and Pierce was severed from the remainder of the action and remanded to the Circuit Court of Covington County, Alabama for further proceedings.

4. On December 18, 1997, although maintaining that it was unnecessary to do so, Plaintiff filed a Motion For Leave To Amend "so that his defect theory, which was not fully developed at the time of the original Complaint, but developed during discovery, may be added in final form." (Pl.'s Mot. For Leave To Amend at 1.) For the reasons discussed *infra*, the court finds that Plaintiff's Motion For Leave To Amend is due to be denied.

belts;" (2) in the August 10, 1997 report of Plaintiff's expert Andrew Gilberg, Plaintiff's seat back recline theory was first mentioned; (3) Plaintiff's September 17, 1997 Proposed Pretrial Order only mentioned his instability claim; (4) in the October 2, 1997 deposition of Andrew Gilberg, Plaintiff, upon cross-examination of his own witness, educed testimony regarding window glazing, passenger door latches and seat-belt anchorage points; and finally, (5) Plaintiff's October 16, 1997 Proposed Pretrial Order contained no mention of his instability claim, but did propound theories of defect based on the seat back recline angle, seat-belt anchorage points, window glazing and door latches.

These problems with Plaintiff's amorphous allegations formed the basis of GM's October 20, 1997 "Supplemental Motion For Summary Judgment, Motion To Strike, And Motion To Dismiss." GM requested that the court strike those portions of Plaintiff's pleadings that GM alleged were previously unpled or undisclosed. Pursuant to an October 22, 1997 Order from the court, Plaintiff filed a Brief and supporting evidentiary material on October 23, 1997 in response to GM's Motion To Strike that outlined Plaintiff's specific allegations against GM as well as evidentiary support in the record supporting those allegations.

Because the Motion To Strike and Plaintiff's response raised serious allegation of misconduct by both sides throughout the discovery process,[5] GM's Motion was referred to the Honorable Vanzetta Penn McPherson, the United States Magistrate Judge managing discovery in this action. The Magistrate Judge conducted a hearing on GM's Motion on November 21, 1997, and issued her Recommendation on November 26, 1997. Judge McPherson recommends that GM's Motion To Strike be granted, and that Plaintiff not be allowed to proceed with his theories of defect related to: (1) seat-belt anchorage points; (3) passenger door latch defects; and (3) window glazing. Further, Plaintiff conceded at the November 21, 1997 hearing before Judge McPherson that he was not pursuing his instability or seat-belt defect claims. (*See* Recomm. at 23.) Accordingly, because the court finds that Plaintiff's Objections are due to be overruled, all that remains is Plaintiff's theory of defect regarding the passenger seat-back recline angle. As

---

5. Magistrate Judge McPherson noted in her November 26, 1997 Recommendation:

Throughout the discovery process in this litigation, counsel for both parties (to this court's extreme dismay) have acted with "unclean hands." They have failed to observe the letter and spirit of the Federal Rules of Civil Procedure and they have failed to heed the several admonitions of this court. Initial disclosures have not been submitted; discovery responses have not been supplemented; expert information was withheld until the experts' depositions; and pretrial deadlines were missed. This court has devoted excessive time to resolving discovery disputes, most of which should never have arisen.

The court is further disturbed by either counsel's tendency to acquiesce in or to begin engaging in the unprofessional conduct practiced by opposing counsel. This "tit for tat" behavioral pattern is juvenile and is looked upon with great disfavor in this court. The Federal Rules of Civil Procedure were created to provide a litigation framework for parties and counsel in the management of cases and to establish boundaries on acceptable conduct in proceedings before the court and among lawyers. The attorneys for both parties would be well advised to abide by them.

(Recomm. at 27–28) Additionally, either the Magistrate Judge, or this court warned the Parties' of their conduct on three separate occasions: (1) June 17, 1997; (2) August 7, 1997; and (3) October 17, 1997. Each admonition directed the Parties' to modify their conduct—with the threat of sanctions specifically noted. (Recomm. at 7–12.)

This court is reluctant to sanction attorneys for conduct which can be construed as vigorous representation of their clients' interests. Much of the conduct in this action, however, not only violated court orders and unnecessarily consumed excessive amounts of both the undersigned and the Magistrate Judge's time and resources, but also clearly breached applicable standards of professional conduct. Nevertheless, after careful consideration, the court has determined that sanctioning the offending counsel in this matter would not be productive, primarily based on the approximate equipoise of the egregious conduct. The court is quick to note, however, that counsel are directed and warned not to engage in such conduct in future litigation, either before this court or others, and this court, in particular, will not tolerate conduct similar to that undertaken in this action in future appearances before the court, and will readily sanction any offending attorney and report their conduct to the appropriate governing state bar association.

will be discussed *infra*, the court finds that GM's Motion For Summary Judgment regarding this theory, is due to be granted.

## III. THE MAGISTRATE JUDGE'S RECOMMENDATION

GM's October 20, 1997 Motion To Strike was based on what it alleged to be "new, unanticipated and previously undisclosed theories ... elicited for the very first time on cross-examination by Plaintiff's counsel of his own expert, two and one-half years after this case was originally brought." (GM's October 20, 1997 Mot. To Strike at 7.) GM also alleged that Plaintiff "repeatedly failed to disclose what defect theory he intended to try in this case." (*Id.*) Plaintiff argued that it was not until one of his experts, Dr. Wayne Ross, was deposed on October 17, 1997, that his exact theories of defect were "fully fleshed out." (Recomm. at 13.) Further, Plaintiff accuses GM of "actively conceal[ing] the key evidence in this case for approximately one year [photographs of the vehicle taken after the accident but prior to repair]." (Pl.'s Obj. at 1; Pl.'s Resp. To GM's Mot. To Strike at 2; Recomm. at 14.) And, because of this alleged active concealment, Plaintiff contends that he was not able to fully develop his theories. (*See* Recomm. at 6–7.)

### A. Standard Of Review

Upon timely objection to the Recommendation of the Magistrate Judge, as here, the district court shall review *de novo* those portions to which the party objects. 28 U.S.C. § 636(b)(1).

### B. Discussion

Plaintiff contends that "[t]he recommendation of the Magistrate Judge and the interpretation of that recommendation by this Court indicate that neither the Magistrate Judge nor this Court fully understands the single theory of defect advanced by Plaintiff." (Pl.'s Obj. at 6.) Plaintiff contends

that neither this court nor the Magistrate Judge understand that his theory is that the "restraint system" of the vehicle was defective, not just individual components thereof. And, because GM allegedly concealed key photographs from the Plaintiff, his precise theory of defect could not be articulated until after GM's disclosure of the pre-repair photographs.

Contrary to Plaintiff's assertions, the Magistrate Judge understood and the undersigned "fully understands" Plaintiff's contentions. In effect, Plaintiff's counsel seeks to have the court approve of the use of his "new" theory that the "restraint system," as a whole, was defective, without requiring him to specify which specific portions of the "restraint system" are defective, and without allowing GM time to conduct discovery or address this new contention in dispositive motions. As GM notes, "[p]laintiff still has not settled on what defect theory he would intend to present at trial, and continually postures that by using the term 'restraint system' he can virtually try any component of the vehicle which an occupant may contact during an accident."[6] (GM's Resp. at 1.)

The court finds patently unpersuasive Plaintiff's argument that he "does not, and has never, restricted [his] definition of the restraint system, to what lay people might think is the restraint system." (Pl.'s Obj. at 7.) Plaintiff argues that there never were "additional theories of defect, but that instead the discovery process refined and clarified the single theory of defect which has been advanced by Plaintiff during the entire discovery process." (*Id.* at 5.) He states his theory of defect to be "that the vehicle at issue is defective and unreasonably dangerous to the consumer because its *restraint system* failed to keep Plaintiff inside the vehicle during a rollover." (*Id.* at 7 (emphasis added).) As noted, *supra* note 6, however, the "restraint system" can include virtually any component of the vehicle.

---

6. Indeed, Plaintiff provides evidence in support of GM's assertion on page 20 of his Objections. In attempting to show that his theory has always been that the "restraint system" of the vehicle, as a whole, was defective, Plaintiff quotes from the reports of Andrew Gilberg, Bruce Enz and Dr. Robert Burney. Mr. Gilberg describes the "restraint system" as possibly including: the seat, seat-belts, center console, instrument panel, floor pan, roof pillars, window and windshield headers, windshield, side windows, door, tailgate, rear window and roof of the vehicle.

As an initial matter, the court questions the sincerity of Plaintiff's assertion. If the "restraint system as a whole" theory was truly Plaintiff's theory all along, the court is at a loss to understand why only "instability" was alleged in the Complaint, and why specific *component parts* of the "restraint system" were emphasized at various points throughout the litigation. If Plaintiff's theory was that the "restraint system" was defective, why was the focus initially on instability, then on the passenger seat-belts, then on window glazing, door latches, and the seat back recline angle. Contrary to Plaintiff's contention that this was a result of the "refinement" of his theory of defect in this action, it appears to the court from a review of Plaintiff's expert's reports, and other pleadings, that as those experts could not substantiate certain theories of defect in various component parts of the vehicle, Plaintiff simply moved his focus to others. Now, when his experts cannot convincingly point to a specific defect in a specific component part, Plaintiff seeks to reach a jury by merely alleging that the "restraint system," generally, was defective.[7]

The Magistrate Judge considered and rejected Plaintiff's arguments that:

(1) under notice pleading, a complaint is not required to set forth theories;

(2) GM did not file a motion for a more definite statement and filed an answer;

(3) the unpled theories were disclosed, in part, upon cross-examination of Plaintiff's expert Andrew Gilberg;

(4) another of Plaintiff's experts, Dr. Ross, disclosed all of the unpled theories in his deposition;

(5) GM had notice of the unpled theories because they were set forth, albeit in general terms, in the reports of Plaintiff's experts;

(6) the new theories were set forth in the proposed Joint Pretrial Order, and it "subsumes" the Complaint;

(7) GM is used to defending these types of claims; and

(8) GM will not be prejudiced.

(*See* Recomm. at 24.) First, the Magistrate Judge construed Plaintiff's additional theories as a motion to amend filed out of time. (*Id.* at 25.) Citing to Federal Rule of Civil Procedure 15 and *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090–91 (10th Cir.1991), the Magistrate noted that "[w]hile plaintiff's counsel is correct that '[a]s a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover ... a late shift in the thrust of the case [must] not prejudice the other party in maintaining his defense on the merits.'" (*Id.* at 1091.) As the Magistrate succinctly summarized the situation:

> Here, by plaintiff's counsel's own admission, the additional unpled theories were not "fleshed out" until the deposition of Andrew Gilberg, plaintiff's expert, on 2 October 1997—29 days before the October 31st discovery deadline. The additional unpled theories were not put into written form until 16 October 1997 when the plaintiff submitted its proposed Joint Pretrial Order to GM. GM, therefore, had written notice of the new theories a mere fifteen days before the discovery deadline. At that time, GM's experts had already provided their reports addressing only the issues of seat belts and seat back recline. Indeed, counsel for GM represented at oral argument that it had not even discussed the new theories with its experts. The scheduled trial date is 8 December 1997—just a few days away with the Thanksgiving Holidays in the interim. GM cannot possible prepare to defend these new theories in such a short time frame. The additional theories are untimely and prejudicial and should not be considered by the district court.

(*Id.* at 27.)

At the onset of the court's discussion regarding the pre-repair photographs, it is im-

---

7. Plaintiff's experts don't address instability, have found no defect in the passenger seat-belts, and Plaintiff has abandoned these claims. (*See* Recomm. at 23.) Indeed, Plaintiff's "new" theories seem to have been developed only after Plaintiff's expert Andrew Gilberg informed Plaintiff's counsel of possibly analogous case law from another jurisdiction. (*See* GM Mot. To Strike, Ex.5, Gilberg Report at 6.)

portant to note that the "new" theories of defect at issue are Plaintiff's allegations regarding: (1) seat-belt anchorage points; (2) door-latch defects; and (3) window glazing. Plaintiff argued to the Magistrate Judge, and argues now, that he could not fully develop or disclose these theories because GM conspired with counsel for the other Defendants to withhold pre-repair photographs of the subject vehicle from the Plaintiff.[8] Plaintiff's contention is that his new theories of recovery were only capable of development after these "key" photographs were "finally" disclosed by GM and viewed by his experts. (*Id.* at 14; Pl.'s Obj. at 2–6.)

GM stated that it received copies of these photographs from counsel for former Defendant Pierce on July 30, 1997, and that its experts were sent copies on that day. (Recomm. at 15.) On August 8, 1997, GM produced the report of one of its experts, Keith Schultz. (*Id.* at 16.) The report indicates that Schultz had reviewed "photographs of subject vehicle taken by Tony Pierce." (*Id.*) Plaintiff produced the report of his expert Bruce Enz on August 13, 1997. (*Id.*) In that report, Mr. Enz states that he had reviewed "photographs of the vehicle." (*Id.*) GM stated that based on this reference, it assumed that the Plaintiff had copies of the photographs taken by Pierce. (*Id.*) On August 21 and 22, 1997, GM produced additional expert reports indicating that the experts reviewed "photographs of subject vehicle taken by Tony Pierce," and "Tony Pierce's photos of vehicle taken after accident." (*Id.*) GM also argued that Defendant Pierce was in possession of these photographs from as early as May of 1995, and that Plaintiff failed to make appropriate discovery requests from Pierce. (*Id.* at 21.) In fact, the Magistrate Judge "was not unmindful of the plaintiff's failure to address whether he sought to discover the photographs from defendant Pierce." (*Id.*)

After a thorough review of the record, the Magistrate Judge concluded that although GM was not entirely without fault, Plaintiff still had notice of the existence of the photographs in early August of 1997, when he received the expert report of Keith Schultz. (*Id.*) In so finding, the Magistrate rejected Plaintiff's arguments that GM didn't respond with enough specificity to Plaintiff's discovery requests, (*Id.* at 17), and Plaintiff's argument and admission that he did not review the experts' entire reports but merely concentrated on their opinions. (*Id.* at 20.)

In rejecting these arguments, the Magistrate noted that while Plaintiff's counsel "now seeks a rule of specificity, throughout this litigation, the plaintiff's discovery responses have been vague, ambiguous and subject to legitimately multiple interpretations." (Recomm. at 17.) And, in rejecting Plaintiff's counsel's contention that he did not review the entirety of the expert's reports, the Magistrate noted Plaintiff's counsel's "propensity—in this case—for carelessness." (Recomm. at 20, n.14.) At oral argument, Plaintiff conceded that a proposed pretrial order was prepared by a paralegal in his office and was submitted without his review, and that a motion to compel was not signed by him, but by a young lawyer in his office who was unfamiliar with this action. (*Id.*)

The undersigned has also experienced Plaintiff's "propensity—in this case—for carelessness." GM filed its Motion For Summary Judgment on August 25, 1997. As of October 21, 1997, Plaintiff had not responded to GM's Motion. On October 22, 1997, in an effort to ensure that the record before the court was complete, the court spoke with Plaintiff's counsel via telephone and inquired whether Plaintiff had filed a response to GM's Motion For Summary Judgment. Plaintiff's counsel responded that he "had not received a Show Cause Order from the court" regarding GM's Motion For Summary

---

8. Based on a cryptic conversation between counsel that took place during Plaintiff's August 21, 1996 deposition, the Magistrate Judge questioned Plaintiff's counsel's assertion that he had no knowledge of the existence of pre-repair photographs of the vehicle prior to their disclosure by GM. (Recomm. at 14, n.7.) The court has reviewed the transcript of Plaintiff's August 21,

1996 deposition, and notes that despite Plaintiff's counsel's assertion that the photographs being discussed therein were post-repair photographs of the vehicle, at the least, the transcript discloses Plaintiff's failure to provide proper discovery. (*See* GM Mot. For Summ. J., Browder Depo. at 115–116.)

Judgment, and accordingly had not responded. A review of the record discloses, however, that the court did not issue a Show Cause Order for GM's motion, *or* for former Defendant State Farm's Motion For Summary Judgment also filed on August 25, 1997. Nevertheless, even without a Show Cause Order, Plaintiff *responded* to State Farm's Motion, but not to GM's. No doubt in response to the court's inquiries, Plaintiff finally submitted his Response to GM's Motion For Summary Judgment on November 14, 1997.

The implication of Plaintiff's counsel that the court is somehow responsible for his failure to diligently prosecute his client's case, is disingenuous at best, spurious at worst, and irresponsible no matter how construed. Plaintiff's counsel is an experienced practitioner and is or should be aware of the obligation to respond to any dispositive motions raising meritorious defenses. Magistrate Judge McPherson's admonition to Plaintiff's counsel regarding his conduct is telling:

> A party should not be prejudiced by a deficiency in the internal operations of opposing counsel's law office. Moreover, pursuant to Rule 11 of the Fed.R.Civ.P., counsel's signature on a pleading constitutes a representation to the court that the information contained therein is stated "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances." Under this standard, the conduct of both lead counsel and the "young lawyer" places them at some risk of sanctions. **The court is compelled to note its surprise that such an argument was advanced by experienced counsel and advises counsel to refrain, in future proceedings, from assigning responsibility for deficiencies in pleadings to persons who are not counsel of record, especially if such persons are non-lawyers, who, in any case, are not licensed to practice law.**

(Recomm. at 20, n.14 (emphasis added).) As the Magistrate noted, "Plaintiff's counsel should not, nor should any counsel be, rewarded for not being thorough." (*Id.* at 20.)

As noted, in an effort to place blame on GM, Plaintiff alleges that counsel for GM conspired with counsel for the other Defendants to keep the pre-repair photographs from Plaintiff. (Pl.'s Obj. at 17.) Plaintiff contends that GM knew of the pre-repair photographs, and deliberately chose not to retain possession of them so that GM's counsel could argue that he did not have "custody or possession" of the photographs. (*Id.*) Plaintiff contends that "[c]ase law is clear, however, that control is defined not only as possession, but as the legal right to obtain documents requested upon demand." (*Id.* (citing *Searock v. Stripling*, 736 F.2d 650 (11th Cir.1984).)) The only proof Plaintiff offers in support of this accusation is the Affidavit of the driver of the vehicle and former Defendant, Tony Pierce. Pierce states that counsel for the Defendants met at his home, and "seemed excited" when they saw the pre-repair photographs of the vehicle. (*Id.*, Ex. 1, ¶ 4.) He also states that counsel took the photographs with them, and he is unaware of what happened to the photographs subsequently. (*Id.*, Ex.1, ¶ 5.)

The court finds these arguments unpersuasive. First, contrary to the suggestion of Plaintiff's counsel, Pierce's Affidavit does not establish a conspiracy to withhold evidence from the Plaintiff. Second, GM has submitted the Affidavit of their counsel Alan Thomas, who states unequivocally that:

> At no point in time prior to receiving these photographs ... in late July of 1997 did I ever have possession of the photographs, custody of the photographs, or control over the photographs. Nor did I have any right of possession to the photographs. I did not take any action to prevent the Plaintiff from obtaining these photographs. Additionally, it is a matter of record in this case that Plaintiff Browder and his family have consistently had personal contact with Mr. Pierce and his family from the day of this accident through obviously today. I have no way of knowing whether these photographs may have been provided by the Pierces to the Browders at any time before or during the pendency of this case.

(GM's Resp., Ex. B, Thomas Aff. at 3–4.) Third, under Plaintiff's proffered definition of

"control," he too had "the legal right to obtain documents requested upon demand." As the Magistrate noted, Plaintiff tellingly failed to properly request such discovery from Defendant Pierce. (Recomm. at 21.) Although the Magistrate noted that GM failed to timely supplement discovery, (*Id.*), absent proof of any "conspiracy,"[9] and in light of the deficiencies in Plaintiff's discovery requests, Plaintiff's arguments are unpersuasive.

Fourth, and perhaps most importantly, Plaintiff glaringly fails to explain exactly how these pre-repair photographs were key to developing his new theories. For example, regarding Plaintiff's seat-belt anchorage point and door latch defect theories, GM noted in its Response to Plaintiff's Objections that:

> Although Plaintiff has attempted to use these photographs as a broad excuse for non-development of his case, nowhere in Plaintiff's Responses to the Motion to Strike or Objection to the Magistrates Order is there any reference that these photographs have any bearing whatsoever on Plaintiff's belated seatbelt anchorage point or door latch claims. . . .

> Plaintiff has attempted to belatedly introduce an allegation that the 1994 Chevrolet Blazer (the "Blazer") should have incorporated seatbelts into the seats, rather than anchoring the seatbelts on the B-pillar, as in almost all vehicles. All 1994 Blazers—including the subject Blazer—have always had the seatbelts mounted on the B-pillar. Plaintiff's expert Andrew Gilberg has opined in his report that the seat back was intentionally reclined by Mr. Browder at the time of the accident. It is apparently Plaintiff's expert's opinion that Plaintiff's intentionally reclining of the seat back changed the configuration of the seatbelt positioning, and thus allowed Plaintiff to slip out of the belt system during the rollover accident. *See* Andrew Gilberg's report, attached to Defendant's original Motion to Strike.

> The only defect referenced in Plaintiff's expert's report is that the defect in the

vehicle was that the seat back is allowed to recline while the vehicle is in motion. If Plaintiff also intended to raise seatbelt anchorage positioning as a defect in this case, and argue that a torso belt-to-seat design was an alternate design theory, the opinion or conclusion appears nowhere in his expert reports. This Court's Scheduling Order and the Federal Rules of Civil Procedure clearly provide that all conclusions and opinions of an expert are to be included in the report. The photographs do not change the anchorage points of the belt system, or add any information to support this alternate theory. The photographs have nothing to do with the seatbelt anchorage claim, or with Plaintiff's failure to ever plead, respond to Interrogatories, or provide expert reports on these issues.

Plaintiff also makes a curious argument that the door latch is somehow relevant to this suit. In short, Plaintiff states that because General Motors experts opine that Plaintiff was ejected out the passenger side window, he wishes to pursue a claim against the door latch. Plaintiff's position that the photographs have anything to do with the door latch issue is spurious. In fact, Plaintiff does not even argue the point in his Objection to the Magistrate's Recommendation.

The photographs actually contradict Plaintiff's assertion. They show the door in a fully-closed position. The photographs are entirely consistent with the April 2, 1997, deposition testimony of Tony Pierce, wherein he stated that the door was still shut after the accident. *See* Pierce deposition, p.20. More importantly, Plaintiff's door-latch theory is contrary to his own expert's testimony and opinions. All of Plaintiff's experts have opined that the ejection portal was the rear passenger-side window. Finally, Plaintiff's own experts themselves conclusively negate that a possible open-door ejection occurred. Andrew Gilberg's Affidavit, filed by Plaintiff in response to Defendant's Motion for Summary Judgment on the seatbelt and seat back recline issue states: "Plaintiff

---

**9.** Plaintiff offers various unsubstantiated allegations that this "conspiracy" continued at various

points throughout this litigation. (*See, e.g.*, Pl.'s Obj. at 1, 4, 15–18, 22, 24, 26, 31–36.)

contends that Mr. Browder was ejected from the vehicle through the passenger rear window opening, the ... front door closure system did not cause his injuries." *See* Affidavit of Andrew Gilberg, p.2, attached as Exhibit "A" to Plaintiff's Opposition to Defendant General Motors Corporation's Motion for Summary Judgment. Plaintiff has conclusively negated that an open-door ejection occurred, and Plaintiff's experts themselves prove it could not, in any way, be a proximate cause of Plaintiff's injuries. A door-latch issue belongs nowhere in this case.

(GM's Resp. at 4–6.) Plaintiff's only response to this argument was to unconvincingly, and with little explanation, attach copies of the photographs to his Reply to GM's Response and to mark them "to indicate the importance of these photographs for the reclining/seatbelt attachment arguments." (Pl.'s Reply at 2; Ex.3.) Further Plaintiff offers no response to GM's contentions regarding Plaintiff's door latch theory.

Plaintiff's markings on the photographs are not supportive of his assertions. Plaintiff could also have discovered the location of the seat-belt anchorage points from an inspection of the vehicle, an inspection of a like vehicle, an inspection of the design specifications of the vehicle, an inspection of post-repair photographs of the vehicle, interrogatories, or from other sources. All of this information was available to the Plaintiff through discovery disclosures, and could have been obtained even earlier from other sources had Plaintiff thoroughly investigated his case. As for Plaintiff's door latch claim, as noted, Plaintiff offers nothing in response to GM's assertions quoted above, and there is no evidence of how the pre-repair photographs were "key" to Plaintiff's door latch theory. Further, as GM noted, Tony Pierce stated that the passenger door remained closed during the accident. (*See* State Farm Ex., filed August 25, 1997, Pierce Dep. at 22.) Accordingly, the court flatly rejects Plaintiff's implication that the only source from which he could develop his seat-belt anchorage or door latch theories were the pre-repair photographs of the vehicle.

As for Plaintiff's window glazing theory, it is undisputed that the first notice GM had that Plaintiff intended to pursue this theory of defect was from Plaintiff's counsel's examination of his own expert, Andrew Gilberg, on October 2, 1997. (Recomm. at 23; *see also* Recomm. at 22, n.5.) Similar to the door latch and seat-belt anchorage theories, Plaintiff's position regarding the window glazing is that the "laminated glass argument could never be advanced until these [pre-repair] photographs were revealed," (Pl.'s Reply at 2), and that until then, "[p]laintiff could not even tell whether laminated glass was used in the vehicle." (Pl.'s Obj. at 30.) Again, Plaintiff asserts a similar argument as asserted regarding the door latch and seat-belt anchorage theories—that he wasn't aware of a possible defect until afforded the opportunity to examine the pre-repair photographs.

However, similar to Plaintiff's development of his door latch and seat-belt anchorage theories, the pre-repair photographs are also not the sole source of information regarding the type of glass utilized in the Blazer at issue. Plaintiff had, or could have had, access to design schematics, specification sheets, the vehicle itself after repair, an exemplar vehicle, or other sources of information detailing the type of glass utilized in the vehicle. Plaintiff could also have sought further information regarding the glass, or type of glass utilized in the vehicle through interrogatories.

Further, Plaintiff knew from the deposition of Tony Pierce on April 2, 1997 that the windows of the Blazer had been "busted out" during the accident. (*See* State Farm Ex., filed August 25, 1997, Pierce Dep. at 24; GM's Resp. at 7–9.) This knowledge should or could have alerted Plaintiff to the possibility of developing a window glazing defect theory and led to an investigation or more detailed discovery requests. Plaintiff's expert Andrew Gilberg admitted initially that "my opinions on how this accident happened and what the counter measures for the accident are don't involve glazing." (Pl.'s Resp. To GM's Mot. For Summ. J., Gilberg Depo. at 60–61.) In an October 22, 1997 Affidavit, however, Gilberg equivocates, and states that the now disclosed pictures, which he did not

have access to at the time of his deposition, may substantiate a window glazing defect theory. (Pl.'s Reply To GM's Resp., Ex. 2, Gilberg Aff.) Plaintiff also submitted the Affidavit of Bruce Enz where he states that he was unable to determine the type of glass in the vehicle without the aid of the photographs, and consequently could not state with certainty a theory of defect regarding the window glazing in the particular vehicle at issue. (*Id.*, Enz Aff.) Information regarding the type of glass specifically installed in the subject vehicle, however, could have been garnered from sources other than the pre-repair photographs.

Plaintiff's Objection as to the window glazing, in particular, and the other theories in general, properly read, is that he could have developed his theories *more easily* if he had had pre-repair photographs of the vehicle earlier. Nevertheless, Plaintiff has not shown how the pre-repair photographs were the sole source of information for development of his theories, and instead attempts to camouflage the real issue—a late change in the thrust of his case.[10] This court will not condone such shenanigans, and, accordingly, finds that: (1) Plaintiff's Objections are due to be Overruled; (2) the Magistrate Judge's Recommendation is due to be adopted, approved, and affirmed; and (3) GM's Motion To Strike Plaintiff's "new" theories, (seatbelt anchorage; door-latch; window glazing), is due to be granted.

## IV. GM'S MOTION FOR SUMMARY JUDGMENT

Also before the court is GM's Motion For Summary Judgment filed on August 25, 1997. On the same date, GM filed: (1) a "Memorandum Brief In Support Of General Motors Corporation's Motion For Summary Judgment" ("GM Br."); and (2) "General Motors Corporation's Proposed Statement Of Undisputed Facts And Suggested Conclusions Of Law." ("GM Proposed Statement"). GM filed their Motion and pleadings in support

thereof in conformance with the court's Uniform Scheduling Order entered June 6, 1997.

Plaintiff responded in his Memorandum Of Law In Opposition filed November 14, 1997 ("Pl.'s Opp'n.") and pleading filed November 18, 1997. After a careful review of the arguments of counsel, relevant law, and the record as a whole, the court finds that for the reasons set forth below, and in addition to and in the alternative to granting GM's Motion To Strike, GM's Motion For Summary Judgment as to all of Plaintiff's theories of defect, including Plaintiff's "restraint system as a whole" theory, is due to be granted.

### A. Summary Judgment Standard

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether

---

10. As GM notes, Plaintiff inconsistently asserts that on the one hand, his theory of defect all along has been that the "restraint system" as a whole was defective and GM had ample notice of his theory, but on the other hand, asserts that the

defects related to the seat-belt anchorage points, door-latch, and window glazing were not known until disclosure of the pre-repair photographs. (GM's Resp. at 7, n.2.) Plaintiff cannot have it both ways.

there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions in the file, together with affidavits, if any,' " that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *see also* Fed.R.Civ.P. 56(e).

In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(c); *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348; *see also Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

11. See the Factual Summary set forth *supra*.

12. In its October 22, 1997 Order, the court stated that it would not consider GM's October 20, 1997 Supplemental Motion For Summary Judgment. However given the unique procedural history of this action, the court now finds that for the purposes of this Memorandum Opinion and Order, that portion of its October 22, 1997 Order denying consideration of GM's Supplemental

### B. Discussion [11]

Plaintiff has admitted in various pleadings and in the November 21, 1997 hearing before the Magistrate Judge that he is no longer pursuing his instability or seat-belt theories of defect. (*See, e.g.*, Recomm. at 23.) Accordingly, for the purposes of addressing GM's Motion For Summary Judgment, the components of the vehicle that Plaintiff claims are defective include the following: (1) seat-belt anchorage points; (2) door latches; (3) window glazing; and (4) the seat-back recline angle.

■ For the reasons outlined below, the court finds that GM's Motion For Summary Judgment is due to be granted regarding all six (6) of the above-named component parts of the vehicle (instability, seat-belts, seat-belt anchorage points, door latches, window glazing and seat-back recline angle). In addition, in the interest of affording Plaintiff the utmost fairness, and in the interest of finality, the court finds that summary judgment is due to be granted to GM regarding Plaintiff's "restraint system" as a whole theory of defect.[12]

■ Plaintiff's claims fall under the judicially created Alabama Extended Manufacturers Liability Doctrine ("AEMLD"). *See Atkins v. American Motors Corp.*, 335 So.2d 134 (Ala.1976). To establish a prima facie case under the AEMLD, Plaintiff must show: (1) that GM manufactured, designed or sold a defective, unreasonably dangerous product; (2) that the product reached the consumer in substantially the same condition in which it was sold; and (3) that the product injured the consumer when it was put to its intended use. *Beam v. Tramco, Inc.*, 655 So.2d 979, 981 (Ala.1995).

■ "[A] defective product is one that is unreasonably dangerous, i.e., one that is

Motion For Summary Judgment is due to be vacated. The court will now consider GM's Supplemental Motion For Summary Judgment on Plaintiff's "new" theories and pleadings in support thereof. Plaintiff is not prejudiced by the court so doing, as the issues and arguments raised therein by GM have already been extensively addressed by Plaintiff in other pleadings.

not fit for its intended purpose or that does not meet the reasonable expectations of the parties." *Id.* at 981. Moreover, "it makes no difference whether it is dangerous by design or defect. The important factor is whether it is safe or dangerous when the product is used as it was intended to be used." *Casrell v. Altec Indus., Inc.*, 335 So.2d 128, 133 (Ala. 1976). Nevertheless, "the manufacturer of a product is not an insurer against all harm that may be caused by the use of the product, and the manufacturer or designer is not obligated to produce an accident-proof or injury-proof product. Likewise, the failure of a product does not presuppose the existence of a defect. Proof of an accident and injury is not in itself sufficient to establish liability under the AEMLD; a defect in the product must be affirmatively shown." *Townsend v. General Motors Corp.*, 642 So.2d 411, 415 (Ala.1994) (citations omitted). To survive summary judgment, Plaintiff must present "substantial evidence" to establish a defect under the AEMLD. *Id.* at 418 (affirming grant of summary judgment in favor of manufacturer because "plaintiffs did not present substantial evidence to establish a defective design under the AEMLD"); *see also Jordan v. General Motors Corp.*, 581 So.2d 835, 837 (affirming summary judgment "[b]ecause [plaintiff] presented no evidence other than evidence that she received injuries as a result of an automobile accident while wearing a GM seat belt, we hold that she did not present substantial evidence to support a claim under the AEMLD"). Pure speculation or conjecture will not suffice. *General Motors Corp. v. Edwards*, 482 So.2d 1176 (Ala.1985).

 When the product in question is of a complex and technical nature such that a lay juror could not, in the absence of expert testimony, infer that a defective condition of the product caused the product's failure and caused the resulting injury to the plaintiff, expert testimony is a necessary component of a plaintiff's case. *Townsend*, 642 So.2d at 415; *Brooks v. Colonial Chevrolet–Buick*, 579 So.2d 1328, 1333 (Ala.1991). Here, Plaintiff alleges that component parts of the vehicle were defective. The court finds that the design, manufacturer, implementation, and use of seat-belt anchorage points, door latches,

window glazing, and reclining seat backs are complex and technical matters, and that a lay juror is unlikely to be able to determine whether they were defective without the aid of expert testimony. Therefore, the court finds that Plaintiff must use expert testimony to establish that these component parts of the vehicle were defective. *See Townsend,* 642 So.2d at 416.

 Before a witness can proffer an expert opinion, he or she must be qualified as an expert. *See* Fed.R.Evid. 702; *Townsend,* 642 So.2d at 423 (citing *McKelvy v. Darnell,* 587 So.2d 980 (Ala.1991).) To qualify, the putative expert must have such knowledge, skill, experience, training, or education that his or her opinion will aid the trier of fact in understanding the evidence. *See* Fed. R.Evid. 702; *Townsend,* 642 So.2d at 423 (citing C. Gamble, McElroy's Alabama Evidence, § 127.01(5)(b)(4th ed.1991); 9 Ala. Digest Evidence Key Nos. 535, 536 (1989)). Whether a particular witness is qualified to testify as an expert is left to the sound discretion of the trial court. *See Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *United States v. Mitchell,* 954 F.2d 663 (11th Cir.1992); *Townsend,* 642 So.2d at 423 (citing *McKelvy,* McElroy's at § 127.01(5)(b)).

 In determining whether to admit expert testimony under Rule 702, the court must "be careful not to cross the line between deciding whether the expert's testimony is based on scientifically valid principles and deciding upon the correctness of the expert's conclusions. The latter inquiry is for the jury and, therefore, judges may not implicitly factor it into their assessment of reliability." *Joiner v. General Elec. Co.,* 78 F.3d 524, 530 (11th Cir.1996), *cert. granted,* —— U.S. ——, 117 S.Ct. 1243, 137 L.Ed.2d 325 (1997). "The critical concerns of Rule 702 are evidentiary reliability and relevancy," *Id.* at 529. These concerns are addressed by the two-step inquiry articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). First, the court must determine whether an expert's proposed testimony pertains to scientific knowledge by

applying the criteria suggested in *Daubert.* *Id.* at 589–90, 113 S.Ct. 2786. This requires the court to. rule out "subjective belief or unsupported speculation." *Id.* at 590, 113 S.Ct. 2786. Second, the court must consider whether the testimony assists the trier of fact in understanding the evidence or determining a fact in issue. This requirement, in essence, is a relevance inquiry. *Id.* at 591–93, 113 S.Ct. 2786. The relevancy relationship between a scientific theory and facts at issue was described by the Supreme Court as one of "fit." *Id.* at 591, 113 S.Ct. 2786. The expert's opinion must "fit" the facts of the case.

▆ Plaintiff's position in opposition to GM's Motion For Summary Judgment is basically that the mere fact that the Plaintiff was ejected from the vehicle during the accident establishes that the vehicle was defective. (Pl.'s Opp'n at 2.) Plaintiff argues that *if* the jury finds that Plaintiff was wearing his seat-belt, then the seat-belt "should have kept Plaintiff inside the vehicle as it rolled. The fact that Plaintiff was thrown out of the vehicle is evidence that some part or parts of the restraint system failed. The failure may have occurred in the seatbelt itself, in the reclining seat back, in the door latch, in the vehicle's windows, or all of the above." (*Id.* at 4.) In support of this assertion, Plaintiff specifically argues that *if* Plaintiff's seat-back was fully reclined during the accident, the design of the seat back recline and seat-belt anchorage points was defective because if the seat-belt which currently attaches to the vehicle frame was attached to the seat instead, Plaintiff would not have been ejected. (*Id.*)

Further, if the jury found that Plaintiff was not wearing his seat-belt, then Plaintiff argues that he "still should not have been ejected from the vehicle, because another part of the vehicle restraint system, namely the glass in the side rear passenger window, should not have failed. The glass throughout the entire vehicle should have been laminated in order to prevent ejection. If the glass had been laminated, then Plaintiff would have remained inside the vehicle regardless of whether he was wearing his seatbelt or his seat was reclined." (*Id.* at 4–5.) In support of these assertions, Plaintiff offered the Affi-

davits of Andrew Gilberg, Dr. Wayne K. Ross, and Bruce Enz. (*Id.,* Ex. A–C.)

GM argues that although Plaintiff alleges that he was wearing his seat-belt, both the Plaintiff and Tony Pierce, the driver of the vehicle, told the State Trooper investigating the accident that Plaintiff was not wearing his seat-belt at the time of the accident. (GM Br. at 2; GM Mot., Ex. 3, Lyles Aff.) Nevertheless, assuming Plaintiff was wearing his seat-belt, Plaintiff's experts admit that there was no defect in the belt, and Plaintiff has conceded that he is not pursuing his seat-belt defect theory. (*See Id.*)

This leads to Plaintiff's next contention, that *if* the seat-back was reclined: (1) the seat-belt anchorage points should have been on the seat itself rather than on the vehicle frame (*if* Plaintiff was wearing his seat-belt); (2) the windows should have been laminated; and (3) the seat back should not have been allowed to fully recline. GM argues that the only way these theories are reached is by *speculating* that Plaintiff's seat-back may have been reclined: "there is no evidence that the passenger side seat back (Browder's seat back) was reclined during the accident," and "Plaintiff's experts admit that there is no evidence to support a theory that the seat back was reclined." (*Id.* at 3.) In support of this contention, GM quotes from the report of Plaintiff's expert Andrew Gilberg, who states that "*if* Mr. Browder had, for some reason, reclined his seat back to near its limits, it is *possible* that he was ejected .... There is no evidence to prove ... that Mr. Browder's seat was reclined." (*See* GM Mot., Ex. 4, Gilberg Report at 5–6.)

▆ Rule 702 of the Federal. Rules of Evidence requires that expert testimony "assist the trier of fact to understand the evidence or determine a fact in issue." Federal Rule of Evidence 703 requires that "the facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made. known to the expert at or before the hearing." As the Advisory Committee Notes make clear, facts or data upon which expert opinions are based may be derived from three sources. Fed. R.Evid., Adv. Cmte. Notes. First, is the "firsthand observation of the witness." *Id.*

Second is "presentation at trial." *Id.* Third is the "presentation of data to the expert outside of court and other than by his own perception." *Id.* Tellingly, nowhere does the rule provide for an expert opinion based on sheer speculation over the circumstances surrounding the issue upon which he or she purports to provide expert testimony.

Basing an "expert" opinion on facts not in evidence is not helpful to the trier of fact in understanding the evidence or determining a fact in issue. *See* Fed.R.Evid. 702. An expert's testimony must be based on "facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Jones,* 861 F.2d at 662 (citation omitted); *see also, Townsend,* 642 So.2d 411; *Kirk v. Griffin,* 667 So.2d 1378 (Ala.Civ.App.1995). Without an underlying basis of support, the "expert's" opinion is only one of many possible theories and interpretations of the facts at issue, and is no more or less helpful than the trier of fact's own reading of the evidence.

While an expert may base an opinion on facts or data reasonably relied upon by experts in the field, and this data need not be admissible in evidence, Fed. R.Evid. 703, "[t]heoretical speculations, unsupported assumptions, and conclusory allegations advanced by an expert ... are [not] entitled to any weight when raised in opposition to a motion for summary judgment." *E.T. Barwick Indus. v. Walter Heller & Co.,* 692 F.Supp. 1331, 1347 (N.D.Ga.1987), *aff'd,* 891 F.2d 906 (11th Cir.1989) (citations omitted). It is well established that "a party may not avoid summary judgment on the basis of an expert's opinion that fails to provide specific facts from the record to support its

conclusory allegations." *Evers v. General Motors Corp.,* 770 F.2d 984, 985 (11th Cir. 1985). "Conclusory allegations without specific supporting facts have no probative value." *Id.* at 986; *see also United States v. 0.161 Acres of Land,* 837 F.2d 1036, 1040 (11th Cir.1988)("certainly where an expert's testimony amounts to no more than a mere guess or speculation, a court should exclude his testimony"). Finally, when causation is the issue being addressed, "'courts are particularly wary of unfounded expert opinion.'" *Bell v. Swift Adhesives, Inc.,* 804 F.Supp. 1577 (S.D.Ga.1992)(quoting *In re Agent Orange Product Liability Litigation,* 611 F.Supp. 1223, 1249 (E.D.N.Y.1985), *aff'd,* 818 F.2d 187 (2d Cir.1987)).

In accordance with the foregoing, the court makes the following findings: (1) based on Plaintiff's admission that he is no longer pursuing instability or seat-belt theories of defect, the court finds that GM's Motion For Summary Judgment on these theories is due to be granted; (2) based on Plaintiff's failure to either respond to any of GM's arguments regarding Plaintiff's door latch theory, or offer *any* evidence in support of said theory,[13] the court finds that GM's Motion For Summary Judgment on Plaintiff's door latch theory is due to be granted; (3) Plaintiff's window glazing and seat back recline theories turn on the question of whether Plaintiff's seat back was actually reclined during the accident. As GM notes, Plaintiff has simply offered no evidence, as Plaintiff's expert concedes, that the seat back was in fact reclined.[14] Accordingly, the court finds that GM's Motion For Summary Judgment on these theories is due to be granted; (4) Plaintiff's seat-belt anchorage theory

---

13. Plaintiff's only response was the unsubstantiated and unsupported allegation that "[t]he front door latch opens during rollover actions. Evidence of independent witnesses, from whom statements have been taken, but no depositions, will show at trial that the front passenger door opened during the rollover of the subject vehicle." (Pl.'s October 23, 1997 Mem./Br/ In Resp. To GM's Mot. To Strike at 6.) Such proffer is insufficient to raise a genuine issue of fact for trial and accordingly survive GM's Motion For Summary Judgment.

14. Plaintiff's expert, Andrew Gilberg concluded that "[a]lthough there is no evidence to prove (or disprove) that Mr. Browder's seat was reclined, there are no other explanations available consistent with all of the evidence." (*See* GM Mot. To Strike, Ex. 5, Gilberg Report at 6.) Gilberg fails to articulate why he believes "there are no other explanations available consistent with all of the evidence," what factors led him to that conclusion, or the methodology utilized. In short, the reliability of his opinion has not been established. Instead, his opinion seems to stem more from his review of a similar automobile liability action in Ohio. (*Id.* at 5–6.)

turns on the assumption that Plaintiff was wearing his seat-belt *and* that the seat back was reclined. Although the evidence suggests that Plaintiff was not wearing his seat-belt at the time of the accident,[15] when viewed in a light most favorable to the Plaintiff, the court cannot so conclusively conclude. Nevertheless, because there is no evidence to substantiate a finding that the seat back was reclined, the court finds that GM's Motion For Summary Judgment on Plaintiff's seat-belt anchorage theory is due to be granted; (5) finally, Plaintiff has failed to offer any evidence establishing that the vehicle in question was substantially unaltered at the time of the accident, and thus fails to establish an essential element of his prima facie case under the AEMLD. *See Beam* 655 So.2d at 981; *Brooks,* 579 So.2d at 1332.

Based on the foregoing, the court finds that GM's Motion For Summary Judgment as to all of Plaintiff's theories of defect, including his "restraint system as a whole" theory, is due to be granted.

## V. PLAINTIFF'S MOTION FOR LEAVE TO AMEND

■ As noted *supra,* Plaintiff filed a Motion For Leave to Amend ("Pl.'s Mot. For Leave To Am.") on December 18, 1997. Although "maintaining that it is unecessary [sic] to amend the Complaint," Plaintiff requests that the court grant leave to amend "so that his defect theory, which was not fully developed at the time of the original Complaint, but developed during discovery, may be added in final form." (Pl.'s Mot. For Leave To Am. at 1.)

■ The decision to grant leave to amend a complaint is within the sole discretion of the district court. Fed.R.Civ.P. 15. Rule 15(a) of the Federal Rules of Civil Procedure,

however, limits the court's discretion by mandating that "leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a); *see Halliburton & Assoc. v. Henderson, Few & Co.,* 774 F.2d 441 (11th Cir.1985). Therefore, there must be a substantial reason to deny a motion to amend. *Id.* Substantial reasons justifying a denial include "undue delay, bad faith, dilatory motive on the part of the movant, ... undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

Plaintiff argues that he has "abided by every order of this Court, has not acted in bad faith, and has no dilatory motive. Plaintiff is simply seeking to have his case determined on the merits rather than being dismissed due to overblown technicalities. Furthermore, there will be no prejudice to [GM] if leave to amend is granted, since the case has been continued, and since [GM] has been provided with this information during the discovery process and before the discovery cut-off." (Pl.'s Mot. For Leave To Am. at 2; *see also* Pl.'s Obj. at 13.)

The court has disposed of Plaintiff's theories of defect through adoption of the Magistrate Judge's Recommendation, and through granting GM's Motion For Summary Judgment. Both the Magistrate Judge's Recommendation and this Memorandum Opinion and Order highlight the undue prejudice GM would face if Plaintiff was allowed to amend his Complaint. Further, the court finds that the "undue delay, bad faith, [and] dilatory motive on the part of the movant" factors work against the Plaintiff, as well. Plaintiff now seeks to substantively amend his Complaint over two and one-half years after his original Complaint was filed, well after the

---

15. Plaintiff alleges that "[t]here is evidence indicating that Plaintiff was wearing his seatbelt at the time of the accident." (Pl.'s Opp'n To GM's Mot. For Summ. J. at 4 (citing Ross Dep.).) Dr. Ross concluded that Plaintiff was belted from his examination of the passenger seat-belts. In sharp contrast to Dr. Ross' conclusion, however, is Plaintiff's admission to the State Trooper investigating the accident that he was not wearing his seat-belt. Plaintiff has noticeably failed to address this admission in any of his pleadings.

(GM's Mot. For Summ. J., Ex. 3.) Further Tony Pierce specifically told the State Trooper that he was wearing a seat-belt but Plaintiff was not. (*Id.*) Later, Tony Pierce stated that although he knew he was wearing his seat-belt, he couldn't recall whether Plaintiff was wearing his. (GM Mot. For Summ. J., Ex. 2, Pierce Dep. at 21.) Finally, the vast majority of the expert opinions offered conclude, in contrast to Dr. Ross, that there is no evidence that Plaintiff was wearing his seat-belt.

deadline for amendments set forth in the court's Uniform Scheduling Order, well after expert reports were exchanged, well after discovery closed, after GM filed its Motion To Strike Plaintiff's previously unpled or undisclosed theories, after the Magistrate Judge issued an unfavorable Recommendation, and after the court continued this action only because of the controversy surrounding Plaintiff's last minute change in theories. Plaintiff simply misses the point—the only reason this action was continued was *because of* Plaintiff's previously unpled or undisclosed theories. The court finds that Plaintiff's Motion For Leave To Amend Complaint is due to be denied.

### *ORDER*

After a thorough review of the Magistrate Judge's Recommendation, and an extensive independent review of the record, it is hereby CONSIDERED and ORDERED that Plaintiff's Objections to the Magistrate Judge's November 26, 1997 Recommendation be and the same are hereby OVERRULED, and the court hereby ADOPTS, APPROVES and AFFIRMS the Magistrate Judge's November 26, 1997 Recommendation.

Accordingly, it is further CONSIDERED AND ORDERED that:

(1) GM's Motion To Strike be and the same is hereby GRANTED.

(2) Additionally, and in the alternative, GM's Motion For Summary Judgment on all of Plaintiff's theories of defect, including his "restraint system as a whole" theory, be and the same is hereby GRANTED.

(3) Plaintiff's Motion For Leave To Amend his Complaint be and the same is hereby DENIED.

(4) The court's adoption of the Magistrate Judge's Recommendation and the entry of this Memorandum Opinion and Order disposes of any pending issues before the court. Accordingly, Blue Cross/Blue Shield's May 20, 1997 Complaint In Intervention is hereby DISMISSED, and this action is DIS-

MISSED in its entirety, each party to bear his or its own costs.